## THE MOOSABEE.

## THE MORGANZA.

(District Court, E. D. Virginia. July 24, 1923.)

1. **Maritime liens ⟨⟩30—Supply and material men are charged with knowledge of ship owned by United States being under charter providing against liens.**

Supply and material men are chargeable with notice of ship being under charter, and so of provisions thereof against liens, where the slightest examination of its papers would have disclosed its ownership in the United States, and put them on inquiry.

2. **United States ⟨⟩77—Liability against United States in personam, where its ship under charter, if privately owned, would have been liable in rem to shipper.**

Where goods shipped in good condition on a vessel belonging to the United States, but under charter, were damaged by negligent delay in delivery, so that vessel, if privately owned, would have been liable in rem, there is, under Act March 9, 1920 (Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼*l*), a similar liability against the United States in personam.

3. **Shipping ⟨⟩209(2)—Right to limit liability for damage to shipper on its vessel under charter held lost by its course of action.**

Any right of United States, under Act March 9, 1920, § 6 (Comp. St. Ann. Supp. 1923, § 1251¼e), to limit liability for damages to shipper on its vessel under charter was lost, where it caused publication of advertisement for presentation of claims, and promised payment on approval, and did not take steps for limiting liability till long afterwards, when vessel's value had greatly diminished.

In Admiralty. Libels against the United States as owners of the Steamships Moosabee and Morganza. All claims except that of H. R. Silver, Limited, against the Moosabee, dismissed.

Hughes, Little & Seawell, of Norfolk, Va., and C. Elwood Colahan, of New York City, for H. R. Silver, Limited.

Hughes, Vandeventer & Eggleston, of Norfolk, Va., for William H. Swan & Sons, Inc.

William F. Purdy, of New York City, and Hughes, Vandeventer & Eggleston, of Norfolk, Va., for P. H. Gill & Sons Forge & Machine Works.

Earl W. White, of Norfolk, Va., for Whitney & Kemmerer.

Hughes, Little & Seawell, of Norfolk, Va., for Robinson.

Paul W. Kear, U. S. Atty., and H. H. Rumble, Sp. Asst. U. S. Atty., both of Norfolk, Va., for the United States.

GRONER, District Judge. The libels against the United States, as owners of the above-named vessels, have been consolidated, and will be dealt with in one memorandum.

The claims against the Morganza are on behalf of Whitney & Kemmerer and P. H. Gill Forge & Machine Works. The claims against the Moosabee are asserted on behalf of H. R. Silver, Limited, C. G. & J. W. Robinson, N. H. Slack Grocery Company, Wm. H. Swan & Sons, and P. H. Gill Forge & Machine Works. No proof is offered on behalf of the Slack Grocery Company's claim, and the same, having been abandoned, will be dismissed.

The claims against the Morganza arise out of the same contract or charter between the Shipping Board and the operator of the vessel as was the case in United States v. Baker, Carver & Morrell, decided by the Supreme Court January 2, 1923, commonly known as the Clio and Morganza Case, 1923 A. M. C. 47, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361. The claims here urged are no more meritorious than were the claims rejected by the Supreme Court in the case cited, and on the authority of that case these claims are denied.

[1] The cases of the supply and material men asserted against the Moosabee depend upon a somewhat different state of facts. The Moosabee was a wooden steamer of 2,500 gross tons, registered at Portland, Or., and owned by the United States of America, represented by the United States Shipping Board. She was employed as a merchant vessel until early in 1921, when she was tied up with the fleet of wooden vessels anchored in the James river. In November, 1919, the Shipping Board adopted a resolution authorizing the charter on a bare boat basis of six steamers to the States Steamship Corporation, a Delaware company, at the rate of $19,000 per month per boat, with an option to purchase at $103 per dead weight ton. Under the contract, the Morganza was delivered on February 17, 1920; the charter party containing the usual provisions, including an agreement not to permit any lien, incumbrance, or charge to be had superior to the title and interest of the United States. The Moosabee, which was not originally named as one of the vessels to be chartered, was delivered on May 7, 1920, in the place and stead of the Oyka. No bill of sale or written charter party was executed for the Moosabee, and her record title continued thereafter in the United States to the same extent as before the delivery of the vessel, although it appears by stipulation of the parties, and from the evidence of the witness

Roby, that the intention of both the Shipping Board and the steamship company was that her delivery should be and was upon the same terms and conditions as those obtaining in the case of the Morganza, except that the option to purchase should be on the basis of $50 per dead weight ton instead of $103, as authorized in the resolution of November, 1919.

If this be a correct statement of the facts, it would seem to me that the claims for supplies and repairs against the Moosabee should be placed in the same category as those against the Morganza, since in both cases there was the charter transfer of the vessel to the operator on a bare boat basis, with an agreement to hold free of liens or claims of any kind superior to that of the United States, and, since knowledge and information of this fact was easily obtainable upon application to the Shipping Board, or any of its duly authorized agents, and the slightest examination of the ship's papers would have disclosed the ownership in the United States of the vessel and put the party in interest upon notice, it seems to me clear that the applicable rule under these circumstances is that announced by the Supreme Court in the Carver Case, supra, viz.: "If by investigation with reasonable diligence the materialman could have found out that the vessel was under charter, he was chargeable with notice that there was a charter; if in the same way he could have found out its terms he was chargeable with notice of its terms."

In none of the claims was this rule observed. Such investigation as was made was superficial, and in most of the cases none was really attempted. This is not surprising, since at the time the impression prevailed more or less generally that a lien resulted without it, but, the Supreme Court having now decided otherwise, it follows that the failure to observe due care to ascertain the vessel's status must result in a dismissal of the petitions. This being so, it follows necessarily that the claims of Robinson, Swan, and the Gill Machine Works are rejected.

[2] This disposes of all the claims except that of H. R. Silver, Limited. This libelant was a fish dealer, organized under the laws of Canada, with an office in Halifax, and with no office or agent in the United States. The Moosabee, having been delivered to the States Steamship Corporation, as described above, was, in August and September, advertised in the newspapers of New York as about to sail from New York to Havana.

Her agents were the Congress Lines, and the impression created by the advertisement was that she was part of a regular service between New York and Havana. The advertisement solicited freight for transportation to Havana and other Cuban ports. In early September, 1920, Silver, desiring to ship a number of packages of dried codfish to Havana, made inquiry of the Congress Lines as to freight rates, space, and other matters incident thereto. The inquiry was followed by an extended correspondence, both by mail and telegraph, between the Congress Lines and Silver, and resulted in the delivery by Silver of two consignments of codfish for shipment to Havana. The first shipment went forward in the Morganza, and was apparently delivered in good order. The second, by arrangement between the parties, was delivered to the Moosabee at New York, for shipment to Havana, and was received and receipted for in good order, about the middle of September, 1920. The vessel was delayed in New York, and did not sail until October 17th, and did not reach Havana until December 17th, having put in at Matanzas on October 25th, where she remained until December 16th. A discharge of the cargo at Havana was not commenced until February 21st; the packages of codfish being discharged on February 22d. Upon survey, the codfish was found to have sustained serious damage, was rejected by consignee, and sold for whatever salvage could be obtained, and the net loss to Silver amounted to $12,447.89.

The agreed statement of facts shows that on October 7, 1920, a receiver was appointed for the States Steamship Corporation, the receiver, being one Miggins, Comptroller of the United States Shipping Board at New York, and that on November 17th the Shipping Board, apparently for the purpose of expediting the return of the vessels to the United States, advanced to the receiver the sum of $20,000 and on the 23d the further sum of $24,000, and the sums so advanced were used for defraying the operating expenses and disbursements of the Moosabee, as well as other vessels, title to which was in the Shipping Board, a large portion of the amount in the payment of port expenses of the Moosabee at Matanzas. After discharging a part of her cargo at Matanzas, she left that port and arrived at Havana on December 17th, and on December 27th the Shipping Board, to protect its equity, by resolution provided funds for the payment of valid claims against the Moosabee, on January 3d terminated its agreement with

the States Steamship Corporation, and on January 11th took formal possession of the vessel. Between the last-named date and February 21st nothing apparently was done to further discharge the cargo, but on February 21st the discharge commenced, and, as has been stated, the damaged codfish was unloaded the next day. It is insisted by this libelant that the United States are liable in personam, first, because of the provisions of the act of 1920; secondly, because the United States assumed control over the operation of the vessel while the cargo was still undischarged; and, thirdly, by reason of the offer of the United States to pay the claim, and its acceptance by libelant. It is apparent, from what has been said, that if the Moosabee had been privately owned she would have been liable in rem for failure to deliver the codfish in good order. It had been received in good order and had been delivered in bad order, and it is agreed that the damage was due to the negligent and unjustifiable length of time that the codfish remained in the hold of the ship. The circumstances shown by the evidence make the ship in a case like this an insurer, for there is nothing shown which in any respect excuses the delay or otherwise explains the damage, and under those circumstances section 3 of Acts 1910 (36 Stats. 604 [Comp. St. § 7785]) has no applicability. It follows therefore that, since the vessel was liable, by reason of the provisions of the Act of March, 1920 (Comp. St. Ann. Supp. 1923, § 1251¼–1251¼*l*), there is a similar liability against the United States in personam.

[3] In addition, however, to disputing this conclusion, the United States have undertaken to limit their liability, if any, to the value of the ship, and to this end about six months after the institution of this suit they surrendered the vessel to the marshal of this district, and, by an order of court entered on the 24th of February, 1922, over the objection of this libelant, she was ordered held by the marshal to await the determination and settlement of the claims against the United States growing out of her operation. This order of the court, however, was entered without prejudice to the right of this libelant, or any other libeling petitioner in the cause, to insist upon his right of recovery in full against the United States in personam; in other words, the acceptance of surrender of the vessel was consented to by the court without changing the status quo as between the parties in any respect. The position of the United States now is that the

liability which is asserted in these proceedings against the government, if any exists, is a liability of the vessel, that by the Suits in Admiralty Act the government consents to be sued on such liability in order to prevent arrest and detention of its vessels, but that this immunity from arrest is for the benefit of the United States, and may be waived; in other words, that in any case in which the liability is in rem alone and the value of the res is less than the amount of the claim, the government may waive the exemption from arrest created by the act in its favor, surrender the vessel, and limit its liability to the value of the vessel, and this too without admitting any liability. Stated in still other words, that, while denying the liability of the res, it may contest its personal liability as well as the rem liability, by a surrender of the ship, and, however the case may turn, restrict its personal liability to the value of the vessel.

Under the limited liability statutes, in order to avail of their benefits, the owner is required to surrender his vessel, in order that her value may be ascertained, as of the end of the voyage during which the liability arose. If the right now proposed be sustained, the value of the vessel would be ascertained and the right of recovery (subject to a finding in favor of libelant) limited to the value as of the date of surrender. The question is novel, and no authority is cited in its behalf, and there is room for such argument against the right thus claimed. The conditions of the act prohibiting the seizure of a government vessel provide that "in cases where if such vessel were privately owned, * * * a proceeding in admiralty could be maintained, * * * a libel in personam may be brought against the United States." Section 2 (Comp. St. Ann. Supp. 1923, § 1251¼a). Interpreted in its ordinary sense, this language would mean neither more nor less than the right of substitution of the United States in the place of the vessel, without limitation on the amount of recovery, and it is at least not unreasonable to say that, if Congress had meant to limit the sum of recovery to the value of the vessel, provision would have been made to this effect; and force is given to this suggestion by the terms of section 6 of the act (Comp. St. Ann. Supp. 1923, § 1251¼e) providing "that the United States * * * shall be entitled to the benefits of all exemptions and of all limitations of liability accorded by law to the owners, charterers, operators, or agents of vessels"—a provision which at

least would tend to show that Congress intended to extend to the government the same privileges which by law were given private owners and, at least by implication, to confine them there. But, however this may be, conceding for the purpose of this case, the right of the United States to waive immunity, and, in a case in which there is no liability against the government in personam, to leave the parties aggrieved to the remedy they would have had except for the provisions of the act—that is to say, a proceeding against the vessel—such waiver of immunity and surrender of the property must at least have been reasonably coincident with the occurrence out of which the liability grew, unless by reason of special circumstances such a course is impracticable, for it would be, it seems to me, thoroughly unjust and unreasonable to say that such a right, if it exists at all, continues indefinitely, and may be exercised when it is to the advantage of the government to exercise it, and withheld when it is to its advantage to withhold it.

The circumstances in the present case, instead of excusing and explaining the delay, clearly demonstrate this, for, when the claim here asserted arose, the value of the Moosabee, admittedly, was more than the amount of the claim, but at the time of her surrender, more than a year after, her value was far less. And the other facts which exist in this case, not only fail to justify the course that was adopted, but add additional reasons for denial of the limitation claimed, for not only were the United States at least in part responsible for the damages sustained by libelant, in their failure, after cancellation of the contract with the States Steamship Corporation, and the repossession of the vessel, to discharge the cargo with reasonable promptness—except for which the damage would undoubtedly have been lessened, and might have been altogether avoided—but in December, 1920, and again in January, 1921, by resolution duly adopted by the Shipping Board, authority was given to pay all legal claims against the Moosabee, and a committee appointed to receive and audit the same. As a result of this resolution the Shipping Board caused to be published in the newspapers of New York an advertisement requesting the submission of such legal claims for audit, and promised payment thereof upon approval of the committee. Libelant duly presented its preliminary claim on February 15, 1921, and its final and adjusted claim as soon as its loss was ascertained. It continued thereafter to expect the carrying out by the United States,

through the Shipping Board, of the terms of the resolution of the Board and the advertisement made pursuant to the same, and its claim so filed was pending before the Board until rejected in the fall of 1921, at which time it filed its libel.

As has been said, the surrender of the vessel was in the latter part of February, 1922; so that from February, 1921, to September, 1921, libelant was lulled into a false security as to the status of its claim, and had no reason to anticipate the necessity of a lawsuit to obtain its money, and from September, 1921, until March, 1922, it was without other right or remedy than that afforded by the statute. On the latter date the government concluded to attempt to limit its liability, while still contesting it, by a surrender of the vessel, which in the meantime, by reason of the decline in the ship market, represented little or nothing of value. And the question is: May this be done? Conceding the right, when it is availed of promptly (as to which I reserve opinion), would it not be the grossest injustice to libelant to allow it to be done under the conditions now obtaining. It seems to me the answer is self-evident. To hold that such a position would not be countenanced by any court exercising equity, on the part of an individual, goes without saying, and yet it is difficult to understand why, if this be true, the same rule should not apply with equal force to the state. If in the early part of 1921 the United States, acting through the Shipping Board, had chosen to deny liability, both for itself and the ship, it is fair to assume that the libel would have been filed at once, and in such case, if the United States had then elected to waive the immunity created in their behalf by the terms of the statute and surrender the vessel, the result would have been the realization, through her sale, of a sufficient amount of money to pay the claim in full; but this was not done. Instead, the United States repossessed themselves of the vessel, performed the duties incumbent upon the charterer, although in such a way as to increase rather than diminish the damage, and then by solemn act promised to pay legal claims created as the result of the negligent operation of the vessel.

To require the government to respond to this promise to pay may not be permissible in this litigation, but it would be going very far indeed to say that it could take advantage of its broken promise and at the same moment invoke a privilege which would be

denied off hand to a private owner. It seems to me that its position finds no support in law and certainly none in conscience, which brings me to observe, in the striking language of Mr. Justice Field, that "there is no wealth or power equal to that which ultimately comes to a state when in all her engagements she keeps her faith unbroken." Hartman v. Greenhow, 102 U. S. 672, 26 L. Ed. 271.