**PORTER et al. v. BANK LINE, Limited, and three other cases.**

**THE POLERIC.**

(District Court, E. D. Virginia. January 28, 1927.)

**1. Shipping ⬤⟿138—Statutory exemption from liability for fire loss held waived by contract in bills of lading (Comp. St. § 8020).**

Rev. St. § 4282 (Comp. St. § 8020), as construed by the Supreme Court, exempts the owner of a vessel from liability for loss or damage to cargo by fire, in which the owner did not participate personally; but such immunity may be waived, and is waived by a provision in bills of lading that the ship shall not be liable for loss from fire "conditional on the vessel being seaworthy when she sails on the voyage," which substitutes the contract exemption for that of the statute.

**2. Shipping ⬤⟿125—Ship is obligated, after receiving cargo on board, to commence her voyage within a reasonable time under circumstances.**

The reasonable time within which a ship is obligated to commence the voyage after receiving her cargo on board must be determined in connection with all the circumstances.

**3. Shipping ⬤⟿125—Delay in sailing after loading to complete repairs held not unreasonable, and not to abrogate contracts made by bills of lading.**

A British steamship, after making a series of voyages consuming several months, while discharging her cargo and reloading in Calcutta, was found to need considerable repairs to fit her for the next voyage. After survey the repairs were commenced, and expedited as much as possible. It was expected that they would be completed by the time she was loaded, but the loading was done in an unusually short time, and it was 23 days thereafter when the repairs were completed and she sailed. *Held*, that the delay was not unreasonable under the circumstances, and did not constitute a deviation, which abrogated the contracts made by the bills of lading and rendered her an insurer of the cargo.

**4. Shipping ⬤⟿132(5⅓)—Steamship held, on the evidence, unseaworthy at commencement of the voyage.**

A steamship sailing from Calcutta, after being repaired there, for Boston and New York, which on the voyage developed serious boiler and engine trouble and was finally compelled to desist from the voyage at the Azores and proceed to Rotterdam for extensive repairs, *held* unseaworthy at the commencement of the voyage, on evidence that, since her reconditioning at Greenock, six months before at an expense of more than $500,000, she had on each successive voyage developed the same troubles, necessitating her frequent stoppage at sea, and repairs at the end of each voyage, and that the surveyor at Calcutta, who directed the repairs there, was not informed of her previous experience, and failed to locate the seat of the trouble; also *held*, that her unseaworthiness was due to negligence of the owner, which was fully informed of her condition through frequent reports of her chief engineers, which

17 F.(2d)—33

rendered the owner liable for losses to cargo owners.

In Admiralty. Suits by Harry G. Porter and others, by William F. Malcolm & Co. and others, by the Rogers-Pyatt Shellac Company, and by the Riegel Sack Company against the Bank Line, Limited, as owner of the steamship Poleric. Decrees for libelants.

Hughes, Little & Seawell, of Norfolk, Va., for all libelants.

Bigham, Englar & Jones, of New York City, for libelants Harry G. Porter, William F. Malcolm & Co., and others.

Carter, Ledyard & Milburn, of New York City, for libelants Rogers-Pyatt Shellac Co. and Riegel Sack Co.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City, and Baird, White & Lanning, of Norfolk, Va., for respondent Bank Line, Limited.

GRONER, District Judge. These proceedings have been brought by 46 libelants against the Bank Line, Limited, in personam, as owner of the British steamship Poleric, to recover for loss of or damage to cargo shipped upon the vessel at Calcutta in September and October, 1920, to be delivered at Boston and New York.

The vessel put into the Azores during heavy weather, and, after a delay of six weeks, making temporary repairs, was about to sail, when fire broke out in her cargo. When the fire was extinguished, the vessel proceeded to Rotterdam on the advice of all concerned in ship and cargo, and there made permanent repairs.

Such cargo as was in condition to be forwarded was sent to destination. Some of the cargo was destroyed by the fire, and some was damaged so that it had to be sold. All the physical loss of and damage to the cargo that is sued for in these proceedings was caused by fires on board the Poleric, or occurred as a direct consequence of an attempt to put out the fires.

The damages claimed amount to more than $3,000,000. The libels and amended libels allege several grounds of recovery: First, that the vessel was not seaworthy; second, deviation, by reason of unreasonable and unjustifiable delay at the port of Calcutta; and, third, deviation between Calcutta and New York. The last ground of recovery will not be discussed, because it is understood that counsel for libelants no longer insist upon it.

The defense is, first, that the fire statute of the United States (section 4282, R. S. [Comp. St. § 8020]) is a complete bar to any

recovery; second, that the claim of deviation is unfounded; and, third, that the claim of unseaworthiness is not proved.

The Poleric, an English tramp steamer, was built in 1900, to Lloyds' highest class. She was originally named Consuelo, and her name and ownership were changed several times before she came into the possession of her present owners, Bank Line, Limited, and was named Poleric. I do not recall from the evidence that her tonnage is given, but I assume, from her dimensions generally, that she is of about 6,000 tons gross. She is 461.5 feet in length, 52.1 feet in breadth, and 37.7 feet in depth. Her propelling machinery consisted of twin sets of triple expansion engines, and in 1920 she was converted from a coal burner to an oil burner, and new boilers were installed. The installation of the new boilers and the repairs to the machinery of the vessel, which were completed in March, 1920, at a cost of considerably over $500,000, were followed by a second No. 2 survey, after which the vessel left Greenock, Scotland, April 2, 1920, for New York, where she arrived April 23d.

After undergoing repairs and dry-docking in New York, the latter for the purpose of painting her bottom and drawing her tail shaft, she left New York, May 16th, for Colon, where she arrived May 25th. At Colon she was again delayed for repairs, and sailed, on June 3d, for Yokohama, via San Luis Obispo, where she remained two days, and arrived at Yokohama on July 11, 1920. After five days' stop at Yokohama, where repairs were again made to her machinery, she sailed July 16th for Calcutta, via Singapore, Manila, and Tarakan, and arrived at Calcutta September 22d. While at Calcutta she loaded cargo for delivery at Boston or New York, which, by reason of the circumstances already referred to, was either delivered short and damaged, or not at all.

This brief narrative of the vessel and her movements from the date of her reconditioning in Scotland to the period of her arrival in Calcutta is sufficient for the time being. When the question of the seaworthiness of the vessel is discussed, the several stages of the voyage will be noticed more in detail.

[1] It is, of course, obvious that, if the respondent's position that the fire statute is a bar to recovery is correct, a finding to this effect will foreclose further inquiry. It is in order, therefore, to discuss this ground of defense first. The statute reads:

"No owner of any vessel shall be liable to answer for or make good to any person any loss or damage which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner."

The statute has been construed by the Supreme Court as "intended to modify the shipowner's common-law liability for everything but the act of God and the king's enemies, * * *" and "to relieve the shipowner from liability for loss by fire, to which he has not contributed either by his own design or neglect * * *"; i. e., "in which he does not participate personally." Walker v. Transportation Co., 3 Wall. 150, 18 L. Ed. 172. Unless, therefore, the exemption of the statute has been waived by contract or lost by personal negligence, it follows that, by its terms, it is a complete defense to libelants' claims.

The bill of lading, as is usual, admitted the receipt of the merchandise in good order and provided for its delivery at destination in like good order, and contained the following exceptions:

"The steamer is not liable for, or for the consequences of, the act of God, enemies, pirates, robbers or thieves by sea or land, restraint of princes, rulers, and people, vermin, jettison, barratry, *fire on board, in hulk or craft*, or on shore, or any accident, loss or damage whatsoever arising from explosion, collision, heat, machinery, boilers, coal dust, fuel, and steam and steam navigation, or perils of the sea, or of land or of rivers of whatever nature or kind soever, or any act, neglect or default whatsoever of the pilot, master, officers, crew, engineers, stokers, or any agent or servant of the line or any person or persons, in providing, dispatching or navigating the ship or otherwise, or detention, delay or deviation, however caused but nothing herein contained shall exempt the shipowner from liability to pay for damages to cargo occasioned by bad stowage by improper or insufficient dunnage or ventilation or by causes other than those above excepted, *and all the above exceptions are conditional on the vessel being seaworthy when she sails on the voyage,* but any latent defect in the machinery shall not be considered unseaworthiness, provided the same do not result from want of due diligence of the owners or any of them or of the ship's husband or manager." (Italics added.)

It will be seen, from the terms of this bill of lading, that damage from fire on board is one of the excepted causes, but that this ex-

ception is "conditional on the vessel being seaworthy when she sails on the voyage." Is this a waiver of the statutory exemption? Undoubtedly, the benefits of the statute may be waived.

The bills of lading were issued by a British ship in a British colonial port. For this reason, and also because it is important that the decisions of American courts in matters of commercial law should conform to the English decisions, in the absence of some rule of public policy which would forbid (The Turret Crown [C. C. A.] 297 F. 766), it is proper to ascertain the interpretation of similar clauses in bills of lading by the English courts. The cases *directly in point* are surprisingly few in England, and none is cited from an American court.

The leading case in England is Virginia Carolina Chemical Company v. Norfolk, etc., [1912] 1 K. B. 229. There the cargo of a vessel was destroyed by fire which arose while one of the engineers was attempting to repair a cock on a tank of paraffin oil. The cock broke off and the paraffin took fire and destroyed the ship. The libelant claimed that the vessel was unseaworthy by reason of having a defective cock. The respondent pleaded the section of the British Merchant Shipping Act providing an exemption from liability for fire. The language of the British act is so nearly identical with the language of the American statute that it may be correctly said there is no substantial difference between them. Both provide that the owner shall not be liable for damage from fire which may happen to goods or merchandise on board his vessel—the English act, "without his actual fault or privity"; the American statute, "unless such fire is caused by the design or neglect of such owner." In the case last cited the bill of lading provided that the owner should not be responsible for damage caused by "fire on board, * * * *provided all reasonable means have been taken to provide against * * * unseaworthiness.*" It was not, therefore, as exacting on the owner as the Poleric bill of lading, which provided that the exception as to liability for fire, etc., should be *"conditional on the vessel being seaworthy* when she sails on the voyage."

In the lower court it was held that the parties, by providing expressly in the bill of lading the conditions under which the vessel should be liable, as well as her exemptions from liability, had shown their intention to substitute their own provisions for the provisions of the statute, and that this might be done. In the Court of Appeal, to which the case went ([1912] 1 K. B. 237) it was stated, in affirming the trial court, that, "however difficult and ambiguous the construction of the bill of lading may be, yet if the conclusion of an intention to exclude the statute can be reasonably arrived at, that is sufficient to exclude the statute." The words, "I will not be liable for unseaworthiness, provided all reasonable means have been taken to provide against such unseaworthiness," Buckley, L. J., said, though "negative words," are pregnant words, and infer an affirmative, and imply an agreement to be liable in the event of unseaworthiness.

The case went thence to the House of Lords, where it was suggested that the question whether the vessel was in fact seaworthy should first have been determined, and the appeal was adjourned by consent that this fact might be ascertained. [1913] A. C. 52. On the second trial the vessel was found to be seaworthy, and this ended the controversy.

In a subsequent case in the English Court of King's Bench (Ingram & Royle, Limited, v. Services Maritimes, etc., [1913] 1 K. B. 538) the same question was involved, but on a form of bill of lading which, in place of the warranty that the vessel should be seaworthy, contained some general language to the effect that the maintenance of the vessel's class should be a fulfillment of the vessel owner's obligations, and the distinction or difference between the two is pointed out by the appeal judges in their several opinions [1914] 1 K. B. 541, 552–557). It was this fundamental difference in the terms of agreement of carriage that induced the Court of Appeal to reverse the decision of the trial judge. The opinions of the appeal judges, however, unmistakably show a complete adherence to the principle announced in the Virginia Carolina Case. Vaughan Williams, L. J., after discussing the bill of lading in the Virginia Carolina Case, said:

"Now, if the words in the present bill of lading had been to the same effect as the words which I have just been reading from the bill of lading in that case, the judgment of Scrutton, J., would have been right. But, when one looks at the bill of lading in the present case, one sees at once that the words are very different."

Buckley, L. J., also in discussing the Virginia Carolina case, said:

"The parties there had expressly contracted as regards unseaworthiness generally in that by the latter part of the article relating to exceptions they had contracted by negative words that there should be no liability for un-

seaworthiness provided all reasonable means had been taken to provide against such unseaworthiness. * * * From those negative words, therefore, it followed by implication that there was an affirmative contract that the shipowner should be liable for unseaworthiness if reasonable means had not been taken. * * * There are no such words in this case."

I find myself, therefore, unable to agree with the learned counsel for the respondent that the decision in the latter case in any way impinges the principle decided in the former; nor do I think there is anything in the decision in D'Utassy v. Mallory S. S. Co., 162 App. Div. 410, 147 N. Y. S. 313, which is contrary to the decision in the British case first cited. This was a shipment by rail and water. The bill of lading was the uniform bill of lading for carriers by land. It contained a special reservation while water-borne of exemption from liability for fire (R. S. § 4282), but stipulated that this exemption should not apply to loss sustained while the goods were being lightered across rivers or harbors, and the decision confined this limitation to lighterage performed by *rail* carrier, apparently on the ground that the bill of lading was issued by the initial carrier (the railroad) and should not be presumed to bind the vessel carrier unless his intention to waive was clearly shown. On the other hand, in discussing the federal fire statute, the court expressly recognized that it is competent for a carrier to waive this immunity and to extend its liability, and that it should be held to have waived it in any case in which the bill of lading contains provisions which clearly show such intention.

It is entirely true that the Poleric bill of lading does not in express terms refer to the fire statutes either of England or the United States, nor does it in express terms waive their benefits; but, on the other hand, it expressly makes the exemption from *liability for fire* to depend upon a certain fact, namely, the seaworthiness of the vessel at the time of the commencement of the voyage, and in my opinion this language is susceptible of no other construction than that the minds of the parties met in agreement on this subject-matter in accordance with the plain import of the language used, and that under such circumstances there arose thereby an agreement of the owner to be liable for all damage due to unseaworthiness and a waiver of the benefits which the statute otherwise would have secured. If this conclusion is correct, it follows that the statute is not a bar.

In view, however, of the decision which I have reached on the subject of the seaworthiness of the Poleric at the commencement of the voyage, what is said above may after all be wholly academic since, if the ship was not seaworthy, and this fact was due to the personal negligence of the owner, and the failure in that respect was the cause of the loss, that of itself would make the statute inoperative. The Virginia (D. C.) 264 F. 986; Hines v. Butler (C. C. A.) 278 F. 877; The Elizabeth Dantzler (D. C.) 263 F. 596; Asiatic Petroleum Co. v. Lennard's Carrying Co. [1914] 1 K. B. 419–424, [1915] A. C. 705. And this brings me next to discuss the question of liability predicated upon the delay of the vessel at Calcutta, the port of shipment.

The Poleric arrived at Calcutta September 22, 1920. She was almost immediately berthed, and almost immediately began to discharge and receive her cargo; the work both of loading and discharging being carried on at the same time. For most of the loading period the loading crews worked day and night, and the ship was completely loaded on October 7th. She thereafter remained in the harbor of Calcutta until October 30th. On arrival of the vessel at Calcutta it was understood by her master and chief engineer that a number of repairs were necessary to her engines, and by reason of the fact that two of her furnace crowns required jacking up it was considered proper and desirable to call in Lloyds' surveyor in that port, and this was done. The repairs were begun immediately, and continued until the day preceding the departure of the ship. As the repairs progressed, additional work was found to be necessary, and the delay in completion was thereby increased.

It is entirely true that it was originally estimated the repairs and the loading would be completed coincidently; but the loading was done with unusual promptness, and the repairs were to some extent delayed by scarcity of shore mechanics and the general demand for their services at that particular time. However, there is nothing in the record to show the slightest neglect in the completion of the work as rapidly as possible. On the contrary, the evidence overwhelmingly shows that everything was done by the master, the owner's shore superintendent, and the repair yard to expedite the work. Toward the end of the work it was found desirable to install a false face on the I. P. valve, and this work, by reason of a cracked casting, still further delayed the completion.

[2] The work, however, was carried on with

all the speed possible. It was work necessary to prepare the ship for the voyage. The exact time required to accomplish it could not, in the exercise of ordinary care, have been accurately and definitely determined in the beginning, although it was reasonable to believe it would not unduly delay departure. The cargo was loaded with unusual speed, and the time thus consumed, by reason of the overtime employed, was at least a third less than would have been entirely reasonable under the circumstances. The difference between the final loading date and the sailing date was 23 days. The loss of one of these days was due to a strike on the part of the harbormaster's boat crew, so the total delay was at most from 21 to 22 days. It is undeniably the rule that the ship is under obligation, after receiving the goods aboard, to commence the voyage within a reasonable time; but this must be determined in connection with all the circumstances.

[3] The Poleric was in a foreign port; she had just completed a series of voyages of several months' duration; her home port was thousands of miles away, and she was subject to all of the drawbacks and inconveniences that result from this condition. When she came to load there was, as already pointed out, a reasonable expectation that the repairs would be completed about the time of the completion of the loading. The unexpected subsequent delay was hardly any more than would have ensued, had she loaded her cargo with the usual and customary dispatch. There was delay, undoubtedly, and it is not unlikely that what subsequently occurred might never have occurred, except for that delay; but at the same time nothing of this kind should necessarily have been foreseen in the exercise of that prudence and care required of the owner, or in the fulfillment of the obligation assumed in the contract of carriage.

The receipt of the goods and the promise to carry and deliver them implied an obligation to sail within a reasonable time. If for no reason at all the ship continued at her loading port, and loss ensued, there would doubtless be liability; but, where the reason of the delay was to make necessary repairs, believed when begun to be practicable without any delay, and the work was done with all reasonable and proper dispatch, and where, as in this case, the time consumed from the arrival of the vessel for discharging and loading and her final departure was hardly more than would ordinarily have ensued if no repairs had been made, it would be an in-

justice to change the entire relations of the parties, as agreed in their contract, and make the owner an insurer. No case was cited in the argument nor on the brief which goes so far. The Naiwa (C. C. A.) 3 F.(2d) 384, was entirely unlike the instant case. The delay there was for several months, and, although Judge Rose in his opinion states with some fullness the rule of liability in the case of delay, the decision really turned upon the unseaworthiness of the vessel.

In The Moosabee (D. C.) 7 F.(2d) 501, 1923 A. M. C. 874, the delay was not only the direct and proximate cause of the damage, but it covered a period of nearly five months. The same criticism may be made as to other cases cited on the brief; the circumstances were wholly different, and the time lost invariably so much greater as to be unreasonable, which is the real test, and what is reasonable in one case is frequently unreasonable in another; out of which arises the difficulty of fixing a hard and fast rule with relation to time.

On the other hand, the courts have almost invariably said that, while the owner has no absolute right to delay for any length of time, if delay ensues and it is shown to be due to the reasonable necessities of the then existing situation, and is in itself not unreasonable in time, it does not constitute deviation. The delay, therefore, at Calcutta, was not, in my opinion, a ground for setting aside the contract between the parties and holding the vessel liable as an insurer.

[4] And this brings me to the final question: Was the vessel seaworthy at the commencement of the voyage? When the Poleric left the Clyde in 1920, she was a vessel 20 years of age, then reconditioned at very large expense, officially surveyed, and, presumably, in all respects seaworthy. Her boilers were new, her engines had been removed, taken ashore, opened up, and surveyed. Many of her auxiliaries had been removed, sent to the makers, and overhauled, and apparently everything done which was necessary to make the vessel staunch, safe, and in all respects seaworthy. Under these circumstances she sailed for New York, and almost immediately from that time until her final disaster in mid-Atlantic, resulting in her forced return for harbor in the Azores, she experienced a succession of machinery and boiler troubles that has no parallel in the record of any similar vessel within my knowledge.

The character of these troubles indicates that they may have resulted from either continuous and unabated negligence on the part

of her engineroom crew, or some basic, fundamental defect in the machinery itself, in either case intensified by bad weather. The evidence of only a few members of the engineroom crew was taken, but many reports to the owner by the respective chief engineers were produced, as were also the repair bills and the engineroom log, as to all except the trip across the Pacific, and eminent engineers have testified, as experts, for the parties respectively. While the views of the latter as to the cause of the disaster are in direct conflict, the display of erudition, research, and professional knowledge, together with candor and fairness, has greatly aided me in endeavoring to winnow the actual from the speculative wherewithal to reach a conclusion.

If, as is suggested by the very able counsel for the respondent, "the starting point for any statement of facts in the case is at Calcutta," the conclusion reached would be more difficult to sustain. Indeed, it is not going too far to say that an entirely different conclusion might well be reached; but I find myself unable to agree with counsel that the inquiry as to whether the vessel was in fact seaworthy should be begun at Calcutta. What happened there is, of course, of great importance; but, in the view that I take of the situation, it is not decisive. Indeed, to adopt the suggestion would, in my opinion, be misleading, and would leave out of the picture the essential determining facts in answer to the question. As it happens, the conclusion I have reached is based largely upon the fact that what happened at Calcutta in attempting to make the ship seaworthy was wholly incomplete and insufficient, because of the failure of the owner's representative at that port to disclose fully to Lloyds' representative the events of the voyage, together with the conditions which brought the vessel into that port in an unseaworthy condition.

In this view of the case it is necessary to begin at Greenock. The voyage to New York consumed 21 days, during which period the engines were stopped at sea for engineroom purposes a greater number of times than ordinarily would be necessary in ten such voyages. On arrival at New York the boiler densities were of such a character as indicated frequent refilling with salt water. The report of the chief engineer to the owner shows in detail the character of trouble encountered. To set out the items of this and other like reports as the ship proceeded from port to port would extend this opinion to undue lengths. It is enough to say that, while many of the troubles were the ordinary incidents of a voyage under the circumstances, the basic trouble was the excessive loss of water from the boilers and the equally excessive use of sea water to make up the loss, which, together with the bleeding of the boilers and the failure of the evaporator, is frankly stated by the chief engineer to be responsible for the failure of the engines to function properly. It was necessary to clean out the pistons, which were choked with dirt through boiler priming, renew the piston rings on one of the engines, the pins on the eccentric straps, to straighten the eccentric rod, and to make various other similar repairs, which would have been totally unnecessary in ordinary practice and under ordinary conditions.

It is true rough weather was encountered during a part of this voyage, and respondent's expert witnesses account for much of the trouble upon the theory that the racing of the engines—the ship being light—caused the damage; and if the whole inquiry were directed to the ascertainment of the cause of the trouble on this voyage alone, this opinion might be satisfactorily accepted; but when the vessel left New York for Colon, after having had her boilers cleaned and scaled, and filled with fresh water, and repairs effected, the same troubles continued. At Colon her afterpeak tank, containing 55 tons of reserve water, was exhausted, and her boiler densities, though far less than at New York, still showed the introduction of salt water, and, consequently, a continued and unnatural loss of feed. Repairs to the engines were necessary at Colon, of a nature and character not to be expected so soon after the repairs at Greenock; her boiler pressure had fallen from 180 to 165 pounds—the invariable result of scale in the boilers and the loss of steam therefrom. From Colon the vessel proceeded to San Luis Obispo, a voyage of two weeks. From the latter point the chief engineer reported to the owner improvement in the engines, but still showing troubles which cannot be explained as reasonable or natural under the circumstances, and specifically reported failure of the evaporator to keep up a sufficient feed for the main boilers, and, as a result, the continuous use of salt water.

From San Luis Obispo the vessel proceeded to Yokohama, a voyage of a little more than three weeks, from which point the engineer reports better results from the engines, but still points out that the piston valve rings of the H. P. pistons require lining up at every port, and always start to leak more or less after six or seven days' steaming, reports one-eighth of scale on the furnace crowns and the

boilers still bleeding, and the report of his assistant, Frazer, shows the crowns of several of the boilers down and a leaking blow-down valve on the port aft boiler and the ship's side cock, and calls attention to the risk involved by this condition in the continuous and unusual amount of salt feed used to keep the water level up. On arrival at Yokohama the boiler densities were four thirty-seconds, proving the truth of these reports.

From Yokohama the vessel sailed, on July 16th, for Calcutta, where she arrived on September 22d. At Kobe, the first stop, the report of the chief engineer shows that the boilers were still bleeding badly; that it was necessary to expand and remove the salt from an unusual number of tubes, and to do a number of repairs. At Shanghai, the next stop, the chief engineer was badly burned as the result of boiler leakage, entailing the shutting down of the boiler, and on July 27th, when the vessel was being shifted, only one engine was available, repairs apparently being made on the other. On the way from Shanghai to Manila the engines broke down twice, and in entering the harbor of Manila both engines were stopped, and the vessel was not under command, and was obliged to remain at Manila for several days for repairs. From Manila to Iloilo, a two days' voyage, the vessel was stopped at sea for engineers' purposes, and at one time both engines were stopped and the vessel was again not under command. From that time on nearly every other day the vessel was stopped at sea for repairs to her engines. Several times the vessel was hopelessly without power. Between Singapore and Calcutta substantially the same conditions obtained.

During all of this time the reports of the engineers to the owner show the same record of necessary repairs, both at sea and ashore, the high densities of the boilers, and the increasing scale. The frequency and similarity of these reports may not be attributed to accident or coincidence. The complaint had become a habit. The vessel had difficulty in getting to Calcutta, and, because of engine trouble, grounded slightly in the river. Her master reported that he had to have a tug to assist him, "as her main engine cannot be relied on to go astern."

The record of the several stages of the voyage from Greenock to Calcutta, of which only a general outline has been given, shows in unmistakable terms that the vessel was consuming at all times an abnormal quantity of boiler feed. Her normal consumption of water was variously estimated by respondent's witnesses at from 10 to 12 tons per day. With a 40-ton evaporator and a reserve supply of 55 tons, replenished at almost every stopping port, there would have been, in the regular course of events, no occasion for the introduction into the boilers of an ounce of salt water; but, in spite of this, with the aid of the evaporator and the reserve supply, it was necessary upon almost every leg of the voyage to fill the boilers with seawater again and again.

There are two explanations of this: On behalf of the respondent, that this condition was primarily due to the negligence of the engineroom force, intensified by bad weather encountered on the voyage; on behalf of the libelants, that from the beginning there was, first, a basic fundamental defect in the machinery, called misalignment, and, second, a failure to carry a sufficient quantity of reserve feed or a larger or better evaporator.

The case necessarily turns upon the determination of which of these positions is correct. To adopt the theory of respondent would be to condemn four different chief engineers for ignorance or disloyalty amounting to crime. Nothing has been shown in the evidence, except the opinions of some of the experts, which would justify this. On the contrary, most of the men against whom this general indictment is drawn had been for years in the employ of the owner, and were regarded as fully capable for their respective tasks. Some are still in its employ, and even now Houston, the owner's engineering superintendent, declares them capable. Such criticism as may properly be made of the qualifications of the juniors could and should have been made as well before the voyage began as now, for the owner had full knowledge of their limitations when the ship broke ground. It would have been more persuasive on this subject if eyewitnesses of this alleged negligence of one set of engineers after another had been produced. This evidence, if it existed, was available to respondent; but, with the exception of Second Engineer Miller, whose manner of testifying—speaking with moderation—did not commend itself to me, none was produced. And while I have no doubt that there were from time to time incompetents among the engineroom staff, as was indeed frankly stated to the owner by its port superintendent when he sent the vessel on her voyage from Calcutta, on the whole, I see no reason to suppose that the engineers, as a class, were not as competent as are usually found on vessels of this type. I find myself, therefore, with great deference to the

opinions of the respondent's experts, unable to accept this view.

With regard to the position of the libelants, I think it may be safely said that there can be no doubt that misalignment of the engines will develop friction and wear, which will, in turn, cause leakage and loss of water, necessitating the introduction of salt water in its place, unless there is an unlimited supply of fresh water aboard; nor is there any doubt that the use of salt water in boilers is injurious. It is equally without doubt that the injury is made more serious in proportion to the extent of the use, and it is not a subject of serious controversy that the damage from such use is not confined to the boilers, but affects, also, the vital parts of the main engines and auxiliaries. The injury to the boilers is due to a deposit of scale formed by the precipitation of the solid matter in the seawater, and consequently the more seawater introduced into the boilers the more scale, and the more the scale the greater the danger of burning out the heating surfaces. The damage to the machinery occurs as a result of priming, and the overwhelming weight of the evidence is that priming is caused, among other things, by seawater, and the effect of priming is to carry the grit or rust through the steam pipes into the engines and auxiliaries, set up friction, and gradually produce wear, and inevitably, the leakage of steam and loss of boiler water.

The evidence, it is true, does not disclose misalignment of the engines until the arrival of the ship at the Azores, but the fact that it was not sooner observed, or that no one is able now to point out precisely when it began, or its exact extent, does not disprove its existence; whereas, on the contrary, the performance of the vessel throughout is consistent with and strongly persuasive of the fact that it existed from the beginning. With a full appreciation of the responsibility, I accept it as a fact, and by the same measure I conclude that the second of libelants' explanations of the trouble should be rejected, for I am satisfied that, with engines and boilers in a seaworthy condition, and a competent crew in charge of the engine room, there was no necessity either for a larger evaporator or additional tanks for reserve boiler feed.

It does not seem to me, therefore, to be especially important to determine whether the loss of boiler feed was from leaking machinery, due to unusual wear through misalignment, or whether it was from leaking machinery, accentuated by priming of the boilers, or whether both were contributing causes.

The fact that there was leakage is satisfactorily proved, as is also the necessary and constant use of salt water, with increasingly harmful effect, which, though checked from time to time by repairs and scaling, invariably returned, and finally resulted in the complete collapse of the machinery.

When the vessel reached Calcutta, her machinery was in the charge of an engineer who had begun the voyage on the vessel, although in a subordinate capacity. Her original chief engineer had been left behind at Shanghai with a burnt foot. The former, however, was familiar with the performances of the engines from the start. Not only is this true, but when the repairs were begun at Calcutta the owner personally was aware, from the reports received from the vessel from time to time, of the extraordinary events of the preceding six months. Its port superintendent and engineer took charge. A surveyor was called in, and a competent repair yard employed. If then and there the engines had been opened up from top to bottom, if a summary of the vessel's troubles prior thereto had been disclosed to the surveyor, and if in the light of this information he had been given a free hand, it might at least be said that the owner had done all that prudence and foresight required to make the vessel seaworthy.

But it is evident, from an examination of the evidence, that, while there was no check on the amount of work which should be done, the surveyor was limited, by this lack of vital information, to those troubles which were obvious. No effort was made to determine the cause of the disease, since the fact of the disease was undisclosed, and, while it is perfectly obvious that instruments and facilities were then at hand to determine definitely the reasons for the extraordinary loss of boiler water and the constant breakdown of machinery, no effort was made to this end. The surveyor has testified that he knew nothing about the previous voyage of the vessel. He states that he only dealt with her as she appeared to be in Calcutta, and that anything that happened before that did not trouble him; that he began his survey because of the damages to the two furnaces, and as he went along, and saw anything that was not right, he would have it opened up, until satisfied that it was right. He was aware of the fact that the vessel had been recently surveyed, and he was mindful of an obligation not to impose an unnecessary expense upon her owner, by a repetition of this survey so soon thereafter. It is true he states that, as a result of his investigation, he

not only gave his certificate of seaworthiness, but stands by it; but it is also equally true that his opinion and the effect of his certificate necessarily is confined to what he saw and what he did, and I think it may reasonably be said that, giving full effect to his testimony, it is clear the survey made by him was not of such character as to disclose the trouble which undoubtedly existed.

When the voyage was resumed, the old troubles soon reappeared, slowly, perhaps, but progressively, definitely, and certainly. The voyage from Calcutta to the time of arrival at Lisbon, while in point of time consumed was what might reasonably be expected, was in many other respects similar to the difficulties encountered before arrival at Calcutta. There was the same, or nearly the same, density of the boilers; there was the same constant use of the evaporator without accomplishing a sufficient supply of fresh water to maintain the proper level of the water in the boilers, and there was a frequent and almost regular use of salt feed. On arrival at Lisbon the new engineer found salt tails at the back of the combustion chambers and leakage from the boiler tubes,' the boiler valves, and the safety valves. His description, in his report to the owner, of the condition of the machinery generally, is convincing evidence to me that what was done at Calcutta did not reach the root of the trouble, for otherwise this condition, if he describes it correctly—and, notwithstanding his subsequent attempt to lessen its effect, I believe he did—is inexplicable upon any theory that satisfies.

Instead of a single day in this port, nine days were required to do the absolutely necessary repairs before the voyage could be resumed, and again, as formerly, things went well for a few days and then the trouble began—the same densities, though an effort was made to reduce them or some of them by blowing down; the same stopping of the engines, sometimes one, sometimes the other, and sometimes both; and the same general character of repairs—and all the time the situation grew worse until the arrival of the whole gale on the night of December 23d and the almost complete collapse of the engines made a return to the nearest port imperative.

The Poleric arrived at the Azores January 1st, and, with the assistance of a tug, was anchored in a safe harbor, and when she was examined there a week or 10 days later, by owner's assistant superintending engineer, the condition of her engines and boilers was of such character that even temporary repairs, sufficient to resume the voyage, could not be made in six weeks. Her combustion chambers were salted to the tops of the bridges; the furnaces were covered with scale; the tubes salted and leaking; the engines out of line; the rods bent, and the auxiliaries almost wholly unfit for use. Her engine room was little more than a wreck, and she was helpless, and I am asked to say that all of this was caused by careless engineers and the storm which she encountered, although other vessels of the same type, in the same storm—notably the Tyne, which arrived at the Azores the same day and passed through the same heavy weather—escaped without any injury to the engines or priming of the boilers.

I do not feel that I may correctly take this view. Undoubtedly, from the 23d of December to the arrival of the vessel in the Azores, the weather was very bad; but it is also true that, when the storm was at its worst, the engines were stopped, and all the witnesses agree that damage such as this could not have been caused under such conditions. After the repairs at Rotterdam—and this to me is a significant fact—the vessel was again put in service, and thereafter encountered so little trouble with her machinery that only twice since that time has she been stopped at sea because of engine room trouble.

It is obvious that the deep-seated trouble which the vessel suffered after the reinstallation of her machinery existed at Greenock and continued until Rotterdam; that this trouble evidenced itself in ways which should have called attention to it; that at every stopping port, and especially at Calcutta, the means were at hand to determine where the trouble lay; that knowledge of this condition was brought home to the owner in the frequent reports already adverted to; and that the failure to determine the trouble and apply the remedy, not only made the ship unseaworthy, but was negligence directly attributable to the owner, and for which the ship is liable. Asiatic Petroleum Co. v. Lennard's, supra; Hines v. Butler (C. C. A.) 278 F. 877.