## MAY v. HAMBURG-AMERIKANISCHE PACKETFAHRT AKTIEN-GESELLSCHAFT.

District Court, S. D. New York.

Oct. 27, 1931.

The report of the Special Commissioner was as follows:

To the Honorable the Judges of the United States District Court for the Southern District of New York:

I, Mark W. Maclay, Special Commissioner, do hereby report as follows:

On December 2, 1930, an order was entered herein referring these causes to me as special commissioner "to hear the evidence adduced by the respective parties, and to report my conclusions thereon to the court with all convenient speed. By this order of refer-

ence it was further ordered 'that said report of the Commissioner shall be advisory only and shall not be construed to be a determination of the issues' and that the commissioner's fees and stenographic expenses of the reference be taxable against the unsuccessful party, unless the Court otherwise orders."

On December 10, 1930, the witness Schier, chief officer of the Motorship Isis, who was about to go to sea, was examined on behalf of the respondent before me. By agreement the trial of the causes was set for December 22d. On December 22d and 23d I was attended by Messrs. McCutchen, Olney, Mannon & Greene and Messrs. Bigham, Englar, Jones & Houston (Henry N. Longley, Esq., advocate), proctors for the libelant, and by Messrs. Haight, Smith, Griffin & Deming, and William Denman, Esq. (Charles S. Haight, Esq. and Charles S. Haight, Jr., Esq.), proctors for the respondent, who presented testimony consisting of 273 pages of minutes, numbered 171–443, inclusive, and exhibits marked Libelant's Exhibits A–H, inclusive, and Respondent's Exhibits, 1, 1a, 3–18, inclusive, which are filed herewith.

In order to facilitate reference to the testimony, all of that taken in New York was given consecutive page numbers, so that pages 1–130, inclusive, cover the deposition of the captain, Respondent's Exhibit 14; pages 131–170, inclusive, cover the mate's testimony, Respondent's Exhibit 15; and pages 171–443, inclusive, cover the minutes of the trial itself.

It will be noted that, contrary to the usual custom, the libelant's exhibits are lettered and the respondent's are numbered. This also was done to facilitate reference and to avoid duplication of identifying letters or numbers, as in the first testimony, taken in Hamburg, Respondent's Exhibit 13, the exhibits attached were designated in this way. It is believed the situation is made clear on pages 171–173 of the trial minutes.

In order to expedite consideration of the case, the respondent filed its brief first, and, after filing and service of the main briefs of the two parties, each was permitted to file a reply. These briefs were filed respectively on December 31, 1930, and January 7, 12, and 15, 1931.

In view of the prevailing doubt as to the most convenient practical way to comply with admiralty rule 46½ (28 USCA § 723) I have prepared this report in the form of an opinion, divided as it seems to me the determination of the various issues of the case logically requires, with an appendix containing findings of fact and conclusions of law stated in brief summary form.

The findings and conclusions thus summarized are intended to cover all points in dispute, but not to include admitted or wholly uncontroverted facts or conclusions such as the due incorporation of the parties. If the appendix is not a sufficient compliance with rule 46½ (28 USCA § 723), it is hoped that the arrangement of the opinion itself will permit the court to supplement the findings and conclusions sufficiently to prevent any prejudice to the parties.

Having considered the evidence and the argument of counsel, I hereby further report as follows:

## I. Statement.

Five libels, designated as actions Nos. 1, 2, 3, 4, and 5, were filed to recover deposits alleged to have been wrongfully required to secure general average contributions claimed by the owner from the several parcels of cargo of the Motorship Isis referred to in the five libels. Five stipulations, Exhibits C–G, inclusive, are in evidence. A further stipulation, concerning the bills of lading in the five suits, Exhibit H, was marked in evidence after the hearing but before final submission of the case. By order entered herein on January 13th, the five actions were consolidated.

The effect of the pleadings and these stipulations is as follows:

(1) The incorporation of the parties and other formal matters are admitted.

(2) All the merchandise referred to in the libels was received on board the motorship Isis in good order and condition, and was shipped and carried under bills of lading, photostatic copies of which are attached to each libel, with the exception of action No. 5. In respect of that cargo, it is stipulated that the forms of the bills of lading were the same as those in action No. 1. Exhibit H. The photostatic copies are stipulated to be correct, with the exception of some of the amounts of freight, which in suits Nos. 1, 3, and 4 are corrected in accordance with Exhibit H.

(3) The cargo was transshipped at Bremen by lighter or lighters to Hamburg, Antwerp, and London, where delivery was refused, unless deposits were made by the respective consignees as security for general average contributions. The names of the parties making the general average deposits, the dates when they were made, the amounts of the deposits, the merchandise in respect of which they were made, the ownership of the merchandise, and the subsequent assignment

directly or indirectly to the libelant of all right, title, and interest in and to the deposits and any cause of action against the respondent by reason of the demand and collection of the deposits, are admitted. Exhibits C–G, inclusive.

(4) The damages demanded in each libel are the respective amounts of the general average deposits with interest thereon from the dates of deposit. The principal amount of damages claimed is as follows:

Action No. 1 ................. $17,800.95
Action No. 2 ................. 1,540.60
Action No. 3 ................. 65,773.28
Action No. 4 ................. 23,852.17
Action No. 5 ................. 13,317.03

$122,284.03

(5) The libels allege that the refusal to deliver without general average deposits was wrongful and in breach of the bills of lading. This is denied by the answers, which allege the refusal to deliver without general average deposits was not contrary to, but in accordance with, the bills of lading.

(6) The separate defense pleaded in the answers is based on paragraphs 4 (liberty to transship), 5 (liberty to forward), 7 (requirement of deposit to secure general average contribution in accordance with York-Antwerp Rules of 1890, etc., and the Jason clause), and 8 (exemption from and limitation of liability in the Harter Act and [Canadian] Water Carriage of Goods Act, 1910), in the case of shipments made under one of the two forms of bill of lading; and on paragraphs 4 (liberty to transship), 20 (general average clause), and 28 (providing a lien on goods for freight and charges), in the case of the other form of bill of lading. Briefly, this defense is that the Isis was seaworthy for her intended voyage on sailing from her last loading port; that the disasters which gave rise to the general average sacrifices were caused by negligent navigation; that under the bills of lading the cargo under such circumstances must contribute in general average; and that the deposits demanded in the libel were properly required to secure such general average contribution from the cargo as ascertained and fixed by competent adjusters, in accordance with the bills of lading.

## II. The Facts.

The following facts either are specifically admitted, are undisputed, or are so clearly established by the evidence as to make any discussion of the evidence unnecessary:

The motorship Isis, a vessel 376.2 feet long, 51.8 feet wide, 28 feet 3¾ inches molded depth, of about 7,000 tons dead weight, equipped with twin screws, driven by engines having 2,400 total horse power, loaded at various Pacific Coast ports with cargo destined for Bremen, Hamburg, and Antwerp. When she left the last port of loading, she was in all respects seaworthy and properly manned, equipped, victualed, and supplied. Exhibit 14, Krueger, 4.

On February 6, 1928, while on her way to Bremen, the first port of discharge, she stranded in the Weser river, and, in getting clear, some hours later, her stern swung across the channel and struck the opposite bank. Most, if not all, of the force of the blow fell on the port side of the rudder, resulting in a twist of 45° in the rudder stock, as was afterwards discovered. When the Isis resumed her way up the Weser, she developed a tendency to sheer to starboard. With the assistance at first of two tugs, and later of three more tugs, she continued on up the river to Bremen, where she arrived without further incident. At this time her draft was 23′ 3″ forward and 23′ 5″ aft.

It is not disputed that this stranding was caused by negligence in navigation.

While the Bremen cargo was being discharged, the rudder was examined by a diver, who found nothing wrong with it. The Isis, then drawing 18′ 6″ forward and 23′ 3″ aft, was dry-docked at 4:18 p. m., February 9th, and the water in the dock lowered sufficiently to uncover all but three or four feet of the rudder.

As the result of an examination held about dusk and after dark by Capt. Reichenbacher, marine superintendent for Hamburg American Line, Inspector Schubert, Adolf Menck, dock engineer of Weser dry dock; John Wuhrmann, dock inspector of the Weser dry dock, and Capt. Krueger, of the Isis, it was found that, although the rudder stock was twisted about 45°, the rudder blade itself was fair and straight in so far as it was visible, and its submerged portion appeared to be in the same condition from such examination as could be made by hand, boathook, and straight edge, assisted by electric searchlight.

On account of the engagements of the dry dock it was necessary to float the Isis within a few hours, and no other dock was available to make complete repairs for a matter of two weeks.

Witnesses called by the libelant testified that it would have been practical in the time

during which the dry dock was available to have unshipped the rudder and removed the rudder and rudder stock altogether; and that both could have been repaired or renewed, if necessary, and replaced in a matter of 6 to 8 days. It was also testified that, if it were not possible again to dry-dock the Isis so as to replace the rudder, it would have been safe to tow her to Hamburg without a rudder, and that this would have been more prudent and safe than the course which was in fact pursued.

Apparently for the purpose of saving time and expense to the vessel, her cargo, or both, it was determined to send the Isis on to Hamburg with her rudder lashed and in tow of tugs. Interested underwriters were informed of the plan, and the secretary of the Hamburg Underwriters Association's average committee reported that, if the rudder were straight and lashed amidships, towage by two tugs from Bremen to Hamburg was considered safe and in order.

Thereupon the rudder of the Isis was lashed by wires led to the quarter bitts and set up with tackles, and the quadrant was secured by one or more set screws. Three tugs instead of two were engaged and took charge of the vessel, one ahead and one on either quarter, when she left the dry dock at about 1:30 a. m. on February 10th. The flotilla entered the Weser river itself at a point about halfway between the points known as kilometer 5 and kilometer 6, and started down stream about 2:11 a. m. against a flood tide.

Between the seventeenth and eighteenth kilometers, the river Lesum enters from the east or starboard side, and the Weser bends quite sharply to the west or port, from the point of view of down-bound vessels. At the time in question, the flood tide current of about 3 kilometers per hour was setting up both rivers.

All went well until after a vessel bound up the river was sighted below this bend, when the Isis was in the vicinity of the sixteenth kilometer. In order to pass, the Isis was navigated somewhat to starboard. She passed the other vessel safely near the seventeenth kilometer, but before she was entirely clear of this vessel she sheered to starboard in spite of the efforts of the tugs and her engines, and, while out of control, she was caught by the current on the port bow in such a way as to strand hard and fast about amidships on the sand spit separating the junction of the Weser and Lesum rivers, near Vegesack.

The time of stranding was 3:52 a. m.

In order to release the vessel from the strand, divers sacrifices were made and expense incurred, consisting principally of the assistance of tugs and the lightering of cargo. These efforts were successful, and on the evening of February 10th the Isis, assisted by tugs, again proceeded up the river to Bremen.

As she had sustained considerable damage on the occasion of the second stranding, extensive repairs were necessary, so that the entire cargo was discharged and delivered at destination by transshipment, and the vessel dry-docked for complete examination.

The average was adjusted and stated by Alfred Schmidt and E. Prosch under date of Hamburg, February 15, 1930.

Before delivering the cargo to the consignees at destinations, the respondent demanded and obtained deposits to secure payment of the general average contribution of each parcel of cargo to the sacrifices and expenses due to the two strandings. This suit is brought to recover back the deposits thus made.

### III. The Bills of Lading.

All of the cargo was shipped under bills of lading on either of two forms. While other clauses are pleaded, those relating to general average are the ones of chief importance in determining the present issues.

Most of the cargo was shipped under a form of bill of lading providing as follows:

"7. General Average shall be payable in accordance with York-Antwerp Rules 1890 and at carrier's option as to matters not therein provided for in accordance with the laws and customs of the port of New York. All General Average statement shall be prepared at the vessel's final port of discharge or elsewhere at the carrier's option. If the carrier shall have exercised due diligence to make the vessel in all respects seaworthy and to have her properly manned, equipped and supplied, it is hereby agreed that in case of danger, damage or disaster resulting from fault or error in navigation or in the management of the vessel, or from any latent or other defect in the vessel, or machinery, or appurtenances, or from unseaworthiness, although existing at the time of shipment or at the beginning of the voyage (provided the defect or unseaworthiness was not discoverable by the exercise of due diligence), the shippers, consignees, or owners of the cargo shall nevertheless pay salvage and any special charges incurred in respect to the cargo,

and shall contribute with the carrier in General Average to the payment of any sacrifices, losses, or expenses of a General Average nature that may be made or incurred for the common benefit or to relieve the adventure from any common peril. The general average statement is to be made up in American Gold Dollars or in British Pounds Sterling or in Reichsmark at shipowners option. The shipowner is entitled to require a deposit in any of these three currencies."

The cargo shipped at Punta Arenas was carried under another form of bill of lading, which provided in paragraph 20, as follows:

"20. General Average, if any, to be adjusted at the Company's option either at Bremen/Hamburg or at final Port of Destination; always according to York-Antwerp-Rules, and as to matters not therein provided for, according to the usages of the place where the adjustment is made up. In case of General Average the contributing value of the ship shall be taxed obligatory in a German port. For this purpose the Owners are bound to declare, if required, the value of the goods and no goods will be delivered without security having been given by the Owners for the due payment of such General Average. Default, Error, Neglect in judgment or mistake, of the Pilot, Master of the Crew in the navigation of the Ship, Defects of the Vessels or her Engines not noticed before and occasioned during the voyage shall not release the Owners from such contribution."

It will be noted that the principal difference between the two forms is the absence in the latter of the express condition that due diligence must be used to make the vessel seaworthy. The Punta Arenas form is thus differentiated from the standard Jason clause, Congdon, General Average (2d Ed.) p. 48, with which the other form is substantially identical.

The libelant contends that under The Irrawaddy (1898) 171 U. S. 187, 18 S. Ct. 831, 43 L. Ed. 130, and The Jason (1912) 225 U. S. 32, 32 S. Ct. 560, 56 L. Ed. 969, shipowner cannot recover from the Punta Arenas cargo a general average contribution to sacrifices resulting from negligent navigation or unseaworthiness, because the absence of the due diligence provision has the effect of invalidating the entire general average clause.

Those decisions of the Supreme Court do not justify this conclusion. In The Irrawaddy, the validity of a general average clause was not in question, and the point in the case was whether, in the absence of an agreement in the contract, the Harter Act (46 USCA §§ 190–195) of its own force entitled the owner to share in a general average rendered necessary by negligence in navigation. The decision in the negative was later thus construed and defined. The Jason (1912) 225 U. S. 32, 54, 32 S. Ct. 560, 56 L. Ed. 969.

The decision in The Jason is that an agreement that, if the owner had exercised due diligence to make his vessel seaworthy, he should be entitled to share in a general average rendered necessary by negligence, was valid and entitled the owner to recover a contribution arising out of a negligent stranding. The Supreme Court did not hold that the absence of the condition that due diligence must be exercised would invalidate the clause, and the opinion specifically states that, "so far as the Harter act [46 USCA §§ 190–195] has relieved the shipowner from responsibility for the negligence of his master and crew, it is no longer against the policy of the law for him to contract with the cargo owners for a participation in general average contribution growing out of such negligence." The Jason (1912) 225 U. S. 32, 55, 32 S. Ct. 560, 564, 56 L. Ed. 969.

The reasoning suggested by the libelant is contrary to the interpretation which the courts have placed on bill of lading exemption clauses, which, if construed literally, would be sufficiently broad to cover damage caused by negligence, unseaworthiness, and failure to use due diligence in that regard. If the owner shows that the loss was due to some peril excepted in the bill of lading in general terms, such as leakage, the cargo claimant recovers only if he proves negligence on the part of the shipowner. In other words, the shipowner is permitted to rely on the contract exemption in so far as its effect is not in violation of the Harter Act, or, for that matter, of the public policy against carrier's limitation of liability for negligence, established prior to the Harter Act. None of these general clauses could be relied on at all if they were invalid in the sense of wholly void.

Thus, before the enactment of the Harter Act, the exception of a loss by thieves or robbers was valid, "unless it be shown that there was negligence on the part of the ship which contributed to the theft or facilitated it," The Saratoga (D. C. 1884) 20 F. 869, 871; and the prohibition of the Harter Act against bill of lading clauses, relieving from liability for negligence in the custody or care of the cargo, limits, but does not invalidate, general exemptions such as "goods on the quay shall be at the sole risk of the shipper"

and "the proper construction of such general language restricts it to cases where the carrier is not at fault for negligence or failure of due care," Cunard S. S. Co. v. Kelley (C. C. A. 1st, 1902) 115 F. 678, 686; Compania La Flecha v. Brauer (1897) 168 U. S. 104, 123, 18 S. Ct. 12, 42 L. Ed. 398; The Toronto (C. C. A. 2d, 1909) 174 F. 632, 634. Exemptions from negligence, leakage, breakage, etc., cannot avail the vessel if she were negligent or unseaworthy, but as thus construed they are not void. The Florinda (D. C. 1927) 22 F.(2d) 159, 163.

I think the general average provision above quoted from the Punta Arenas bill of lading should be construed as impliedly containing the restrictions of the Harter Act, and that, as so modified by such implication, it should be applied and enforced. The practical effect of the general average provisions in the two forms of bills of lading under this construction is substantially the same. It follows that there is not any necessity to consider separately the cargo shipped under the two forms, and all of the cargo will therefore be treated as if it had been shipped under bills of lading containing the Jason clause in the form above quoted.

The foregoing also makes it unnecessary to give separate consideration to expenses arising out of the first stranding, because the contribution of the Punta Arenas cargo only is disputed.

### IV. Jurisdiction.

Neither party entertains any doubt about the jurisdiction of admiralty in the premises. However, as jurisdiction over subject-matter cannot be conferred by consent, I think brief reference should be made to the point in view of the numerous decisions, in this circuit as well as elsewhere, which hold that there is no jurisdiction in admiralty of an action in the nature of a suit for money had and received. United Transp. & L. Co. v. New York & Baltimore T. Line (C. C. A. 2d, 1911), 185 F. 386; Israel v. Moore & McCormack Co. (D. C. 1920) 295 F. 919; The Kootenai (D. C. 1923) 295 F. 422; Home Ins. Co. v. Merchants' Transp. Co. (C. C. A. 9th, 1926) 16 F.(2d) 372. The substance of such a claim is considered to be not essentially maritime and purely equitable at least where the issues are whether or not there was in fact fraud, duress, or other similar ground of equitable jurisdiction.

In the present case, while the respondent denies the allegation of the libel that the deposits were required by duress, there is neither issue nor dispute on the facts themselves in this regard. It is clear that the respondent refused to deliver the cargo to the libelant's assignors, unless the deposits were made, and under such circumstances the deposits were not voluntary. The issue raised is whether the deposits were required in accordance with or in breach of the terms of the contracts of carriage, which obligated the ship to deliver the cargo free of liens or charges except those properly incurred; the decision depends on whether the sacrifices and expenses properly form the basis under the contracts of carriage of a general average contribution from the cargo, to secure which the deposits were required. This is an issue of maritime character arising under bills of lading which are undoubtedly maritime contracts, and must be resolved on evidence which an admiralty court is peculiarly qualified to deal with adequately.

I find and advise the court that jurisdiction should be sustained on this theory and on the authority of Church v. Shelton (Mass. 1855) 2 Curt. 271, Fed. Cas. No. 2,714; The Oceano (D. C. 1906) 148 F. 131, 132; The Fredensbro (D. C. 1927) 18 F.(2d) 983, 984; cf. The Muskegon (D. C.) 10 F.(2d) 817, 1924 A. M. C. 1512; The Valdura (D. C. 1922) 286 F. 747; The Kootenai (D. C. 1923) 295 F. 422.

### V. Deviation.

It seems so clear on any interpretation of the facts that the Isis was not guilty of a deviation that I should not refer to the point were it not for the earnestness with which the libelant urged in oral argument and in thirteen pages of his brief that the respondent became liable as an insurer because the departure of the Isis from Bremen in tow under the circumstances of this case constituted a deviation.

There may be some question whether under the issues framed by the pleadings a charge of deviation may now be considered. G. W. Sheldon & Co. v. Hamburg Amer. P-A-G (C. C. A. 3d, 1928) 28 F.(2d) 249, 251, 252. However, there is no surprise, and the libelant's argument for deviation is based on the respondent's evidence. I shall therefore consider the point. Dupont de Nemours & Co. v. Vance (1856) 19 How. 162, 172–182, 15 L. Ed. 584; The Gazelle and Cargo (1888) 128 U. S. 474, 9 S. Ct. 139, 32 L. Ed. 496.

It is difficult to see how the facts of the case may be brought within the classical definition of deviation, Constable v. National Steamship Co. (1894) 154 U. S. 51, 66, 67, 14 S. Ct. 1062, 38 L. Ed. 903; Hostetter v. Park (1890) 137 U. S. 30, 40, 11 S. Ct. 1, 34

L. Ed. 568; even though the definition is expanded in accordance with the modern developments of the doctrine, as expressed in G. W. Sheldon & Co. v. Hamburg Amer. P-A-G (C. C. A. 3d, 1928) 28 F.(2d) 249, 251. Nothing shown, or even alleged, to have been done by the Isis approaches the default of the owner in The Malcolm Baxter, Jr. (1928) 277 U. S. 323, 48 S. Ct. 516, 72 L. Ed. 901, held by the Supreme Court not to constitute a deviation. Cf. Kish v. Taylor, [1912] A. C. 604.

The Pinellas (D. C.) 45 F.(2d) 166, 1929 A. M. C. 1301, affirmed (C. C. A. 4th) 45 F. (2d) 174, 1930 A. M. C. 1875, is illustrative of the necessary elements of a deviation which are lacking in the case at bar.

The Willdomino (1927) 272 U. S. 718, 47 S. Ct. 261, 71 L. Ed. 491, and dicta in The Malcolm Baxter, Jr. (1928) 277 U. S. 323, 48 S. Ct. 516, 72 L. Ed. 901, hold, as the libelant states in his brief, that the shipowner deviates when he sets out on his voyage knowing that he cannot complete it without a departure from the regular and usual course of the voyage. The latter decision, however, made it plain that mere careless disregard of the vessel's ability to reach her destination is not sufficient, and that, for a deviation to be voluntary and inexcusable, the owner must know that it is actually impossible for the vessel to complete the voyage in accordance with the contract. Surely it cannot be said that, on any interpretation of the evidence, the respondent knew that the Isis could not possibly reach Hamburg in safety. The contention of the libelant, reduced to its lowest terms, is that an owner who permits his vessel to sail in unseaworthy condition and without exercising due diligence to make her seaworthy commits a deviation; and this is precisely what the Supreme Court refused to hold in The Malcolm Baxter, Jr. (1928) 277 U. S. 323, 331, 332, 48 S. Ct. 516, 72 L. Ed. 901.

## VI.   The Cause of the Stranding.

The libelant contends that the Isis sheered to starboard and stranded because her rudder blade was bent as the result of the first stranding. Questions concerning the bend itself will be considered later, and for the purpose of fixing the cause of the stranding it will be assumed that the bend of 5° in the rudder blade existed when the vessel left Bremen.

The direct evidence concerning the circumstances of the stranding is confined to that of the captain and the mate, and the captain of one of the towboats. Their evidence is that no difficulty was experienced in steering the vessel on the way down the river until the junction of the Lesum was approached, in spite of several bends in the channel in both directions. The only evidence adduced to the contrary is found in the investigation and report of the Seeamt. The investigation by the Seeamt was not stenographically reported. This circumstance, together with some obvious errors and the sworn testimony of the witnesses that there were other errors, casts doubt on the accuracy of the report of the proceedings, if not on the thoroughness and accuracy of the investigation itself. While the statements of the captain in the Seeamt investigation are clearly admissible against the vessel, The Potomac (1869) 8 Wall. 590, 19 L. Ed. 511; The Lisbonense (C. C. A. 2d, 1892) 53 F. 293; The Fanwood (D. C. 1894) 61 F. 523; The Bellota (D. C.) 57 F.(2d) 264, 1928 A. M. C. 485, I find that they are sufficiently contradicted or explained by the captain's thorough examination and cross-examination when his evidence was taken.

If there was any bend in the rudder or anything else which affected the steering of the Isis, it would seem obvious, and the expert evidence is that any competent navigator could not fail to have discovered some indication of it by the time the vessel had gone a half mile or at least had reached her full towing speed of 7 or 8 kilometers.

So far as there is any evidence of the engine movements of the tugs, it indicates that all three of them were towing full speed ahead all or most of the time until shortly before the ship grounded.

The captain's estimates of the position of the Isis at the time of various engine movements are not convincing because they are confessedly based on the maneuver book itself, and hence are actually mere inferences from the engine movements, the times of which are clearly established by the maneuver book. However, the entries in the maneuver book tend to support the testimony of the captain, chief officer, and towboat captain, rather than the findings of the Seeamt that the vessel showed a tendency to sheer to starboard on her way down the river. It is quite clear that such use of one engine over the other as appears at various periods is no more than would be expected in navigating the bends in the channel of the Weser, around which the Isis certainly passed successfully between 2:11 and 3:50 a. m.

Thus from 2:24 a. m., up to which time the Isis was probably being straightened out in the channel, until 2:40 a. m., the port en-

gine was stopped and the starboard engine was worked slow ahead at intervals of less than a minute each; the aggregate time of forward movement of the starboard engine being about six minutes out of the total of sixteen. As the vessel must have been going around a gradual bend to port in the channel during most or all of that time, it would be necessary to use the starboard engine more than the port engine for normal steering. If she had in fact a tendency to sheer to starboard, it is scarcely possible that such limited movements of the starboard engine would have been sufficient to correct the tendency; or, approaching the question conversely, if such slight use of her engines was sufficient to keep her in the channel at this time, the power of her engines and the tugs was thoroughly adequate to correct whatever tendency to sheer to starboard there may have been.

From 2:40 to 2:53 a. m. the two engines were used about equally, one minute half astern on the port engine being balanced by five minutes during which the starboard engine was stopped; and between 2:53 and 3:16 a. m. the port engine was stopped and the starboard engine was used slow ahead for several intervals of a minute or less each. Such engine movements are consistent with the very slight bends, first to starboard and then to port, in the channel between the ninth kilometer and the thirteenth kilometer. The interval of 4 kilometers is not about the distance the Isis would be expected to traverse in the 36 minutes between 2:40 and 3:16 a. m. at her average speed over the ground of about 8 kilometers per hour. It is difficult to infer from the engine movements during this period the correction of any tendency to sheer to starboard.

From just above the thirteenth kilometer to the vicinity of the fifteenth kilometer the chart shows a gradual bend to starboard quite similar to the bend to port between the fifth and ninth kilometers. The engine movements between 3:16 and 3:40 show that the port engine was used rather more than the starboard engine, which would probably not be so if the vessel had a tendency to sheer to starboard.

The captain fixed 3:40 as the time when the Isis passed the upbound vessel, which had been sighted below the bend some minutes before. At this time occurs some indication of an effort to turn the vessel to port. At 3:40 the port engine was put half astern and the starboard engine half ahead, but it was not until 3:50, after a number of ahead movements on both engines, that the port engine

was put full astern. At 3:53 the port engine was stopped, and the starboard engine was put full astern, and at 3:54 both engines were put full astern.

From these engine room records it is difficult to infer any tendency to sheer to starboard until 3:45. The entries in Exhibit 7 by inference support the captain's evidence that she brought up at 3:52, as it seems highly unlikely that the starboard engine would have been put full speed astern, which was done at 3:53, until after the vessel had stranded.

Considering the direct evidence, the report of the Seeamt investigation, and the maneuver book together, there is not any reason to believe that the Isis developed any marked tendency to sheer to starboard, and the preponderance of the evidence is that she did not. If there was any such tendency to sheer, the preponderance of the evidence is that the power of the vessel and her tugs was amply sufficient to correct it and to control the vessel.

What, then, caused the Isis to sheer and take the ground? The evidence of Capt. Krueger that the Isis was towed down the Weser at a speed of about 8 kilometers over the ground and 11 kilometers through the water is supported by the probabilities. It sufficiently appears that at 2:11 a. m. the Isis was halfway between the fifth and sixth kilometers, and that at 3:52 she stranded about halfway between kilometers 17 and 18. She thus traversed a distance of 12 kilometers in 1 hour and 41 minutes, or about 7¼ kilometers per hour over the ground. The maneuvers immediately before the stranding probably reduced her average speed, and there are indications that other reductions in speed may have been made. At the time she sighted the upbound vessel, it, is likely that she was proceeding at more, rather than less, than 8 kilometers per hour over the ground.

The ship was about 50 feet wide and the tugs alongside probably about 25 feet each, making the total width of the flotilla about 100 feet. In order to pass the upbound vessel, it was thought, and quite properly so, necessary to keep the entire flotilla on the starboard side of the channel, which was about 300 feet wide. It was thus necessary to maneuver with a clearance of approximately 25 feet on each side, assuming that ordinary prudence required a clearance of at least 25 feet between the passing vessels.

In my opinion, the stranding which followed closely after passing the upbound vessel was due to the Isis' smelling the bank on

the starboard side of the channel. Capt. Davis, a most experienced navigator, particularly of disabled vessels, was very clearly of the opinion that a vessel proceeding at a speed through the water of 6 knots or 8 kilometers, the speed which the Isis was undoubtedly making over the ground, could not pass so close as 30 feet to the edge of such a channel without danger of smelling the bottom and sheering toward the bank. While there is no direct evidence of how close to the edge of the channel the Isis actually was when passing the upbound vessel, the inference is almost inescapable that she was much too close for safety at the speed she was going. It is difficult to understand why the pilot dropped the starboard tugboat and stopped the starboard engine for fear of fouling the chain of one of the channel buoys, unless the Isis was then very close indeed to the bank of the channel.

Capt. Davis explained very clearly that, while it would be prudent to navigate within a very few feet of the edge of a channel at low speed with a head current, it would be highly hazardous to do so at higher speeds. There is other testimony in support of both his reasoning and conclusion.

As the preponderance of the evidence is that the Isis showed no marked tendency to sheer on the way down the river, as there is direct evidence that she was navigated at too high a speed and too close to the edge of the channel, as the expert testimony of experienced navigators shows that a sheer in the direction of the bank is a reasonable and probable consequence of such navigation, and that such a sheer is extremely difficult to check even with the assistance of towboats, and as the theory that the sheer was caused by a bent rudder rests entirely in conjecture, I find and advise the court that the stranding was caused by an error in navigation on the part of the pilot; and that unseaworthiness, if any, in respect of the steering gear of the Isis, did not cause or contribute to the stranding.

VII. Causal Connection Between Unseaworthiness and Disaster as a Condition of the Application of the Jason Clause.

The libelant urges that, if the Isis were unseaworthy and due diligence were not exercised, he may not be called on to contribute in general average, because seaworthiness, due diligence to assure which is required as a condition of the Jason clause and exemption from liability under section 3 of the Harter Act (46 USCA § 192), is literally seaworthiness **in all respects**, quite irrespective of any **causal connection** between the particular unseaworthiness and the disaster giving rise to the loss or general average expense or sacrifice. In support of this contention, it is argued that the requirement that "the carrier shall have exercised due diligence to make the vessel in all respects seaworthy," etc. in both Jason clause and Harter Act, is expressed as a general condition of the applicability of the special agreement in the one case and the statutory exemption in the other case; and that the words "in all respects" are to be construed literally.

There is language in an option of this court, and there is a definite holding by the Circuit Court of Appeals for the Third Circuit in support of this construction of the Harter Act. The River Meander (D. C. 1913) 209 F. 931, 937; The Willdomino (C. C. A. 3d, 1924) 300 F. 5, 11.

The authority of this part of the opinion of the Circuit Court of Appeals in The Willdomino is considerably weakened by the fact that, when the case went to the Supreme Court, the opinion of that court carefully refrained from dealing with the point. Neither that decision nor the language of Judge Holt in The River Meander can now be considered as authority in this circuit, in view of the specific disapproval of the construction of the Harter Act in those cases by this Circuit Court of Appeals in its opinion in Hartford & New York Transportation Co. v. Rogers & Hubbard Co., 47 F.(2d) 189, 192.

The discussion of the point by Judge A. N. Hand in Hartford & New York Transportation Co. v. Rogers & Hubbard Co., as follows, is characterized by the libelant as dicta not binding on me in this case:

"While it is contended that the Harter Act (46 USCA §§ 190–195) requires the owner to provide a ship that is in all respects seaworthy before he can take advantage of the exemptions under that act, this requirement affects only causes of action for damages resulting from unseaworthiness. It is not enough to displace the contract of affreightment and to deprive the vessel of the exemptions of the Harter Act that she was unseaworthy, if the damage was not caused by the unseaworthiness. The Malcolm Baxter, Jr., 277 U. S. 323, 48 S. Ct. 516, 72 L. Ed. 901; The Turret Crown (C. C. A.) 284 F. 439; The Turret Crown (D. C.) 282 F. 354; The Thessaloniki (C. C. A.) 267 F. 67. In view of the foregoing, the language of Judge Morris in The Willdomino (C. C. A.) 300 F. 5, at page 11, to the effect that a

carrier is liable 'wholly without regard to whether or not there was any causal connection between the lack of due diligence to make the ship seaworthy in all respects and the loss caused by the negligence in navigation or in the management of the vessel' cannot be regarded as in accord with the authorities."

Even if the foregoing extract from the opinion of this Circuit Court of Appeals does not actually bind me, it authoritatively persuades me.

The libelant also cites The Wildcroft (1906) 201 U. S. 378, 388–389, 26 S. Ct. 467, 50 L. Ed. 794, and Int. Nav. Co. v. Farr & Bailey Mfg. Co. (1901) 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830, in support of his contention that neither section 3 of the Harter Act nor the Jason clause may be relied on by the carrier where the vessel is unseaworthy in any respect, even though there be no causal relation between the unseaworthiness and the casualty.

In The Wildcroft, although the Supreme Court referred to the Harter Act as requiring that the vessel shall be "in all respects seaworthy," in discussing the testimony in this regard, the opinion upheld the judgment of the courts below that the shipowner had established "that the vessel was seaworthy in the respects involved, and that an inspection had been had, and the valves and connections, the negligent use of which was productive of this injury, found in due order at the beginning of the voyage." Page 387 of 201 U. S., 26 S. Ct. 467, 468. While the court did not have under consideration the question of causation here presented, the fact that it dealt only with the evidence concerning seaworthiness "in the respects involved," that is, concerning the valves and connections "the negligent use of which was productive of this injury," and thereupon held that the ship "was seaworthy in all respects at the beginning of the voyage," is a strong indication that the court regarded the condition of section 3 (46 USCA § 192) as a specific one relating only to seaworthiness as far as it pertained to the disaster itself.

In Int. Nav. Co. v. Farr & Bailey Mfg. Co. (1901) 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830, burlap was damaged by seawater admitted through a port left insufficiently fastened. In the courts below it was found that, although the ship was generally seaworthy and properly equipped, and the failure to close the port properly was due to negligence in the use of proper equipment, nevertheless the vessel was unseaworthy on sailing in respect of that port. From the reports it does not appear that the question of causal connection between the specific unseaworthiness and the damage was even discussed. The Supreme Court held that general seaworthiness was not sufficient, and that, in order to avail himself of the exemption in section 3 of the Harter Act, the shipowner must affirmatively show that he had exercised due diligence to make the vessel seaworthy in the specific respects which caused the loss. It did not hold or intimate that, if the vessel had been in fact seaworthy in the specific respect, she must also have been seaworthy in every other respect.

The decisions holding that, in the event of unseaworthiness, the cargo owner can recover only damages proximately caused by the unseaworthiness, while not decisive of the point, have some bearing. The Malcolm Baxter, Jr. (1928) 277 U. S. 323, 48 S. Ct. 516, 72 L. Ed. 901; The Turret Crown (C. C. A. 2d, 1924) 297 F. 766, 782; Cf. (D. C.) 282 F. 354, 360.

All the cases cited deal with the condition in section 3 of the Harter Act. As far as I am aware, there are no decisions construing the similarly worded condition of the Jason clause, but there seems to be no reason for a different construction.

Under these circumstances, it scarcely seems necessary to go into the intention of the framers of section 3 of the Harter Act and of the Jason clause. Whatever may have been the legislative intent, it is scarcely believable that the shipowning and hull underwriting interests who were responsible for the Jason clause intended that it should come into play only when the owner affirmatively had proved that the vessel was literally seaworthy in every single conceivable respect. Dictates of convenience as well as reasonable and fair construction are opposed to a rule which, if followed to its logical conclusion, would require the shipowner, in case of damage to cargo by unseaworthiness of a plate in the No. 1 hold, or in case of a general average sacrifice due to admittedly negligent navigation, to show that the vessel was seaworthy, not only in respect of her No. 1 plating in the one case or of her navigating equipment in the other case, but also in respect of every single part of hull and machinery and of deck, engine room, and steward's equipment, or that due diligence had been exercised in that behalf. The possibility of permitting the shipowner to escape from liability for, or to recover a general average contribution in spite of, some point

of unseaworthiness, which never results in any damage to any one, is surely neither unjust nor fraught with any practical danger.

Therefore, neither on principle nor on the basis of the decisions on section 3 of the Harter Act by either the Supreme Court or this Circuit Court of Appeals should the contention of the libelant be sustained; and the owner of the Isis may avail itself of the Jason clause, if it shows that the vessel was seaworthy or that it had exercised due diligence to that end, in all respects which caused or contributed to the second stranding in the Weser. As it is not disputed that the Isis was seaworthy and properly manned, equipped, and supplied in all respects aside from the steering gear, and as I have found that the stranding was caused solely by negligent navigation, and was not caused or contributed to by the defect, if any, in the steering gear, I find and advise the court that the general average deposits sued for were demanded in accordance with the contracts of carriage.

The conclusions thus reached are sufficient to dispose of the case. The order of reference, however, directs me to report conclusions on the evidence adduced by the respective parties. Furthermore, a disposition at this time of all the contentions urged by the parties, independently of those already considered, will doubtless expedite the ultimate determination of the case, in the event that the court does not accept, or an appellate court reverses, some or all of the foregoing findings. I shall therefore consider the evidence concerning seaworthiness in fact the due diligence of the owner to make the vessel seaworthy on sailing from Bremen, and the bearing of these points on the issues raised by the pleadings independently of the foregoing findings.

VIII. Seaworthiness of the Isis on Leaving Bremen in Tow Bound for Hamburg.

The seaworthiness of the Isis on sailing from Bremen depends on whether the vessel, whose rudder stock was twisted about 45°, and the upper half of whose rudder blade was straight, assuming either that the lower half was bent or deflected to starboard to the extent of about 5°, or that the condition of the lower half was unknown, was reasonably fit to proceed from Bremen to Hamburg with her rudder secured amidships and in tow of three tugs, one on a hawser ahead and one lashed on either side opposite No. 4 hatch. The Hoheweg, the tug ahead, was of 1,080 horse power and the two other tugs, Ever-

sand and Lankenau, were of about 800 horse power each.

Even one of the libelant's experts conceded that there was really no imprudence in sending a vessel on such a voyage with her rudder lashed amidships, provided the blade itself was substantially straight, and indeed it would be difficult to reach any other conclusion, the basis of which would condemn a large proportion of the towing of steamers which is done every day in harbors all over the world. McLennan's insistence on the contrary view is detrimental to the weight of his evidence.

Hence, in order to establish unseaworthiness it must appear that (1) a deflection as afterwards found in the rudder blade in fact existed or may have existed before the vessel sailed from Bremen, and (2) such a deflection was so extensive as to make it imprudent to tow her at night down the Weser river.

First, what was the actual condition of the rudder blade when the vessel left Bremen in tow? If it was necessary that the Isis should be seaworthy upon sailing from Bremen in order to permit the owner to avail itself of the Jason clause, the burden of proof rests on the owner; and this means, with respect to the actual condition of the rudder blade, that the owner must show by a preponderance of the evidence how the injury was sustained or that it could not have been sustained at any time prior to the second stranding. It is unlikely that the bend in the rudder blade occurred at the time of the second stranding, because there is no evidence that the rudder struck anything on the port side.

The earliest time at which it was definitely known that the rudder blade itself was bent was when the Isis was dry-docked at Bremen after the second stranding. At this time the rudder generally remained amidships as it had been secured, but the blade itself was bent about 5° to starboard, beginning about the middle of the blade. The deflection was 2° or 3° two-thirds of the way from the top of the rudder.

None of the witnesses found this distortion when the vessel was dry-docked at Bremen the first time, but it is clear from the evidence of the respondent's witnesses that the examination which was made might not, and probably would not, have revealed it.

There is no direct evidence of what produced the bend or when it occurred. It might have been sustained on the voyage

prior to the first stranding; it may well have been sustained on the first stranding at the same time the rudder stock was twisted, there being abundant expert opinion on both sides of this question; it may possibly have been sustained at or about the time of the second stranding; or it might have been occasioned by some occurrence, of which there is no evidence, on the two trips up, and the one trip down, the Weser river. Under these circumstances, the matter resting largely in conjecture, I find that the respondent has not sustained the burden of proving that the 5° deflection in the rudder did not exist at the time the vessel left Bremen. It therefore becomes important to consider what effect, if any, the deflection described had upon the seaworthiness of the Isis.

On the issue of whether or not it was safe to start on the trip to Hamburg, assuming that the 5° set in the rudder blade actually existed on sailing from Bremen, considerable expert testimony was produced and hypothetical questions were asked and answered, with the usual inconclusive result. With the exception of the witnesses examined by the respondent abroad, most or all of the expert witnesses lack sufficient familiarity with the actual conditions to go very much beyond generalities. Indeed, even the generalities were not supported with any persuasive reasons except in the case of Capt. Davis, whose appearance and candor in testifying were even more impressive than his experience covering over thirty-three years' activity in salvage work, during most of which time he has been a well-known wreckmaster. He was extremely careful to confine himself to his own knowledge and experience and to the facts actually developed by the testimony and exhibits. His frankness in redirect examination concerning the relative desirability of navigating in daylight or darkness illustrates his attitude in testifying.

Capt. Davis considered that the fact that the Isis left Bremen about 5 feet by the stern was of material assistance in controlling the vessel at slow speed with the assistance of tugs. He declared that the tugs as described in the Hamburg testimony were properly located. While a 5° deflection from the true in the rudder might have affected the steering of the vessel to some slight extent, the tugs provided should have been amply able to overcome any such defect. As between a twin-screw vessel with her rudder in working order without tugs and a similar vessel with her rudder lashed amidships and attended by three tugs, one ahead and

one on each quarter, the former arrangement would give superior control at high speeds and in open water, but the latter would give better control at low speeds and in shallow or congested waters. On cross-examination Capt. Davis expressed the opinion that the former arrangement would give better steering control at speeds over 7 or 8 miles per hour; between 5 and 7 miles per hour, the two arrangements would be about equally efficient; and, at speeds less than 5 miles per hour, the tugs would clearly be able to handle the Isis better than the vessel unattended but with her rudder in operating condition.

The views expressed by Capt. Huseby, an experienced local towboat man, are similar. He thought that the Isis would have to attain a speed through the water of 6 miles per hour or more before she would feel the effect of a deflection in the rudder at all, and even then such deflection would have to be more than 10°. Such a vessel does not attain steerage way so as to feel the effect of a helm hard over until she attains a speed of 3½ to 4 miles an hour through the water. He thought it was scarcely possible, therefore, that so slight a deflection as 5° to 10° would have an appreciable effect on the steering even at a speed of 7 or 8 miles per hour through the water. There was no question in his mind that the three tugs could easily have overcome any effect of such deflection.

These views I adopt as far more convincing than those to the contrary of the other witnesses who failed to support their conclusions with satisfactory reasons from experience.

I should have little difficulty in coming to the conclusion that the 5° deflection in the rudder blade had nothing to do with the stranding, did not render the vessel unseaworthy, did not substantially increase the risks of towage, and is generally an immaterial circumstance, were it not for the fact that two of the respondent's witnesses testified very definitely that they would not have sent the vessel on her voyage to Hamburg if they had thought that the rudder of the Isis was in the condition in which it was afterwards found to be.

It is urged by the respondent that these witnesses may not really have had in mind whether the bend afterwards found was really dangerous, and perhaps merely meant that they would not have sent the vessel to sea if her rudder had been in really dangerous condition. I do not so interpret their evidence, and perhaps technically the respondent is bound by their admissions. My own infer-

ence from this evidence is that these two witnesses merely overdid an effort to establish a character for caution. In spite of what they say, it is extremely difficult to believe that they really would not have sent the Isis on her voyage under tow, even if they had known of a 5° deflection in her rudder blade.

Considerable testimony was directed toward the prudence of sailing from Bremen during the hours of darkness. All of this testimony shows only what is fairly obvious, namely, that any navigation is performed with somewhat more facility under favorable than unfavorable light conditions. The question of light, however, is only one of numerous other conditions governing the voyage of the Isis down the Weser river. The reasons for sailing at night advanced in the testimony taken at Hamburg, and in the captain's deposition, are that the traffic in the river was lighter at night than in the daytime, and the tidal conditions were best about 1 a. m., a little after low water, because the vessel would thus have a head current in the upper reaches of the river and higher water some hours later when reaching shoal places in the lower river. It is clear from the testimony and from the charts that the channel of the Weser river was very well provided with range lights placed quite close together on both sides.

I think the clear preponderance of the evidence is that, if the Isis was seaworthy to sail in the daytime, she was seaworthy to sail when she did.

I therefore conclude that the Isis was not unseaworthy on sailing from Bremen under the conditions under which she actually did sail, including the assumption that she had a deflection in her rudder blade of 5° in the lower half, which was unknown to those in charge of her. In reaching this conclusion, I have not been influenced by the evidence submitted by the respondent tending to show that other vessels, in other places, at other times, under other circumstances, with other issues at stake, have been safely towed, because on familiar principles this evidence is of little or no probative value on the issue of whether or not the Isis was seaworthy or whether it was prudent to sail her under the actual circumstances of this case.

## IX. Due Diligence.

In so far as due diligence to make the Isis seaworthy may become material, there is no question that in general the measures taken by the owner at Bremen were reasonable and adequate, but I find that the respondent has not sustained the burden of proving that the examination of the rudder at Bremen was adequate and would have revealed the bend in the rudder blade if it in fact existed at that time.

While the cargo was being discharged, the rudder was examined by a diver who, according to the testimony of the other witnesses, reported that he found nothing wrong. When the vessel was put in dry dock, she was not taken completely out of water, the level of which was reduced so as to expose about 12 feet of the upper part of the rudder, the lower 3 feet remaining under water. The exposed part of the blade, that is, about 12 feet, was found sound. The captain apparently saw only about half of the rudder, which was also sound. The dockmen, Menck and Wuhrmann, apparently made rather a superficial examination. Another witness made some sort of an examination with a boathook. Other efforts to ascertain the condition of the part of the rudder under water were made, which are interpreted by the respondent as accurate tests by a straight-edge and by the libelant as random pokes with sticks and boathooks. The respondent's witness admitted that the condition which he afterwards found could not have been ascertained in this way.

The effect of the testimony suggested by the above references is, to say the least, unconvincing. But the respondent's contention is further seriously damaged by the fact that it must have been dark, or very nearly dark, by the time the dock was pumped out and the examination made. Indeed, it is conceded that artificial illumination was used in a more or less ineffectual effort to ascertain the true condition of the rudder blade.

The respondent's witnesses gave no explanation of why the rudder was not lifted, and the libelant submitted evidence that this course was practical and prudent. Indeed, Capt. Davis thought it would have been better to leave the rudder entirely loose or to take it off altogether.

This examination left uncertain too much concerning the condition of the rudder blade to be adequate within the very strict rule to which the authorities adhere. One citation should suffice.

In The Julia Luckenbach (D. C. 1912) 200 F. 976; Id. (C. C. A. 2d, 1916) 235 F. 388; Id. (1918) 248 U. S. 139, 39 S. Ct. 53, 63 L. Ed. 170, 1 A. L. R. 1522, a plate deteriorated from the action of salt water and sugar which gained access to the plate through a crack in the cement. The crack was in a peculiarly difficult place to observe, and the

particular region could not be examined without taking up the permanent ceiling. If the cement had been broken, the search, which was made, with lights would have revealed it, but, if it was merely cracked or loose, the defect could not have been discovered without taking up the permanent ceiling, which was not done. Judge Hough held that, even though the defect was more difficult to discover than that discussed in The Alvena (D. C. 1896) 74 F. 252, 255; Id. (C. C. A. 2d, 1896) 79 F. 973, due diligence had not been exercised to make The Luckenbach seaworthy. See, also, The Friesland (D. C. 1900) 104 F. 99; The Manitou (D. C. 1902) 116 F. 60; The Poleric (D. C. 1927) 17 F.(2d) 513; Id. (C. C. A. 4th, 1928) 25 F.(2d) 843.

The respondent's position is not helped by the voluminous testimony concerning the approval of Hamburg underwriting interests; for the requirement is diligence with respect to the vessel, not in obtaining certificates. The Abbazia (D. C. 1904) 127 F. 495, 496; Compagnie Maritime Francaise v. Meyer (C. C. A. 9th, 1918) 248 F. 881, 885; The Negus (D. C. 1923) 298 F. 749, 751, affirmed per curiam (C. C. A. 2d, 1924) 298 F. 752. These cases arose under the Harter Act, but there is no reason to relax the stringency of the requirement in respect of the Jason clause.

The respondent contends that it is not liable for any negligent act of its agent at Bremen in connection with management, provided it supplied a competent agent. In support of this theory cases arising under the limitation of liability statutes are cited.

These cases are not in point, because under petitions for limitation of liability the issue is the privity or knowledge, actual or imputed, of the owner, and hence the method by which the owner delegates supervision is important. Thus, if the owner has selected a competent and adequate agent, he cannot be said to be privy to a negligent act committed by the agent without his knowledge. The Annie Faxon (C. C. A. 9th, 1896) 75 F. 312; Quinlan v. Pew (C. C. A. 1st, 1893) 56 F. 111; The Tommy (C. C. A. 2d, 1907) 151 F. 570, 573. But the duty to exercise due diligence to make a vessel seaworthy is a nondelegable one; and hence, if a competent agent fails to use due diligence to make a vessel seaworthy, the owner has not used such diligence. Int. Nav. Co. v. Farr & Bailey Mfg. Co. (1901) 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830; Dobell v. Steamship Rossmore Co., [1895] 2 Q. B. 408; The Flamborough (D. C. 1895) 69 F. 470; Nord-Deutscher Lloyd v. President, etc., of Ins. Co. of N. A. (C. C. A. 4th, 1901) 110 F. 420, 425.

An inspection is not sufficient unless it is adequate. If the defect could have been discovered by an adequate inspection, the failure of the appointed representative of the owner to make the inspection makes the owner liable. The Friesland (D. C. 1900) 104 F. 99; The Manitou (D. C. 1902) 116 F. 60; The Poleric (D. C. 1927) 17 F.(2d) 513; Id. (C. C. A. 4th, 1928) 25 F.(2d) 843; The Julia Luckenbach (D. C. 1912) 200 F. 976; Id. (C. C. A. 2d, 1916) 235 F. 388; Id. (1918) 248 U. S. 139, 39 S. Ct. 53, 63 L. Ed. 170, 1 A. L. R. 1522. Therefore, I find and advise the court that the respondent has not sustained the burden on it of proving that due diligence was used to ascertain the actual condition of the steering gear of the Isis before sailing from Bremen. This finding is, of course, immaterial to the result, unless the court should not accept the previous finding that the vessel was in fact seaworthy.

But, even on the assumption that the Isis was in fact unseaworthy, and, in addition, that due diligence had not been exercised to make her seaworthy, it remains to determine whether for the purposes of the Jason clause the exercise of due diligence is performed once and for all at the beginning of a voyage or whether due diligence must be re-exercised, so to speak, at the port of Bremen for the trip from there to Hamburg.

### X. The Owner's Obligation at an Intermediate Port.

So far as I am aware, there are not any decisions interpreting the Jason clause in this respect, but no reason has been suggested why the principle of the analogous decisions on the exercise of due diligence under the Harter Act should not govern the present case.

Where a vessel is concededly seaworthy when she sails on her voyage and an unseaworthy condition due to storm is not sufficiently corrected by the master at some intermediate port, the owner is not deprived of his defense under section 3 of the Harter Act. The Guadeloupe (D. C. 1899) 92 F. 670; United States v. New York & O. S. S. Co. (C. C. A. 2d, 1914) 216 F. 61; The Milwaukee Bridge (C. C. A. 2d, 1928) 26 F.(2d) 327, 330.

But the libelant contends that it is otherwise where the owner personally intervenes

by exercising some supervision and control over the action at the intermediate port.

As the requirement of due diligence under the Harter Act is an absolute one on the owner, and cannot be delegated, the character of the particular individual performing the duty does not make any difference. It is, therefore, difficult to see how the discharge of the owner's duty, if any, in this regard at an intermediate port can be made to depend on whether the decision to sail the Isis in the condition in which and at the time when she did sail was made by the head office of the respondent, or whether the decision and control of activities at Bremen was visited in the owner's marine superintendent, or whether the captain deferred to the authority of his marine superintendent. If there were a breach of any duty, it must have been a nondelegable duty, and hence the question presented comes back to the time at which that duty of due diligence must be exercised in order to satisfy the condition of the statute and the Jason clause.

At least as far as concerns the Harter Act, it is too well settled for discussion that this time is before sailing on the voyage.

The libelant contends that the voyage of the Isis should be regarded as a voyage in stages, and that the vessel must be seaworthy at the beginning of each stage; and cites a dictum in The Valentine (D. C. 1904) 131 F. 352, and the decision by the Circuit Court of Appeals for the Third Circuit in The Willdomino (C. C. A. 3d, 1924) 300 F. 5.

While perhaps some of the language of the court in The Valentine is susceptible of the interpretation placed on it by the libelant, it is quite evident from the facts of the case that the fault resulting in the loss, while operating at destination, was not initiated there but at the inception of the voyage; and the owner was held liable because the default of the crew of the lighter related back to the nondelegable duty of the owner at the beginning of the voyage. The default of the owner in The Willdomino also arose at the inception of the voyage. Moreover, the theory of the Circuit Court of Appeals in that case was based on the English stages-of-voyage doctrine, to which further reference will now be made.

The stages-of-voyage doctrine, developed in The Vortigern, [1899] P. 140, is a relaxation of the strict warranty of seaworthiness rather than an additional restriction. The doctrine does not necessarily require a vessel to be seaworthy upon sailing from every intermediate port; but gives the ship-

owner the alternatives of either having the vessel fit at the very beginning for the entire intended voyage, or of having her fit for the first and each ensuing stage of the voyage at the time when she enters on each stage. Carver, Carriage of Goods by Sea (7th Ed.) § 19b. This does not increase the extent of the warranty of seaworthiness, but merely allows the shipowner some latitude in the performance or fulfillment of the warranty. The doctrine arises out of the practical impossibility of fitting a vessel at the outset for a long and complicated voyage, and cannot properly be used for the purpose of increasing the owner's difficulties. The Vortigern, [1899] P. 140, 159, 160; Thin v. Richards, [1892] 2 Q. B. 141, 144.

As the Isis was concededly in every way fitted for the intended voyage, which was not in stages, when she sailed from the last port of loading, the owner's warranty of seaworthiness was thereupon performed and discharged. No sufficient reason has been suggested to increase the extent of the owner's obligation in performing the condition of the Harter Act and the Jason clause beyond his ancient strict warranty.

Indeed, the Circuit Court of Appeals for this Circuit, while accepting the English stages-of-voyage doctrine, has held that, if the vessel is seaworthy on sailing on her intended voyage, all adjustments made necessary by subsequent events "pertain to her management and cannot touch her seaworthiness." The Steel Navigator (C. C. A. 2d, 1928) 23 F. (2d) 590, 592; The Oritani (D. C. 1929) 40 F. (2d) 522, 525. Cf. The Newport (C. C. A. 9th, 1925) 7 F. (2d) 452, 453; The President Polk (D. C. 1930) 40 F. (2d) 665, 667.

Therefore, when the Isis sailed from her last loading port in seaworthy condition for the intended voyage, whatever was done at Bremen in the prosecution of the voyage related to navigation and management, rather than to the discharge of the owner's duty of seaworthiness or the exercise of due diligence to make her seaworthy; and hence, irrespective of what construction be placed on what transpired at Bremen, and even though it should ultimately be determined that the vessel on sailing from Bremen was unseaworthy, and that due diligence to make her seaworthy at Bremen had not been exercised, the respondent had discharged his duty under the Harter Act, and was entitled to the protection of the Jason clause. As I see no reason for a more strict construction against the owner of the Jason clause than of the Harter

Act, I find and advise the court that, when the vessel finally broke ground for the voyage at her last loading port in seaworthy condition and in all respects properly manned, equipped, and supplied for the intended voyage, the general average clauses in the bills of lading were brought into operation; that nothing which occurred thereafter deprived the owner of the right given him by the Jason clause to recover a contribution to general average sacrifices occasioned by the two strandings in the Weser river; and that the general average deposits made as security therefor were demanded and given in accordance with, and not in breach of, the contracts of carriage.

## XI. Conclusion.

At the outset of the trial, I suggested that, unless the damages were complicated or would involve difficulties or delay in producing evidence, proofs concerning both merits and damages should be heard by me, as my interpretation of Judge Woolsey's order permitted such procedure, and the ultimate disposition of the case would be expedited thereby. It developed, however, that neither proofs nor accurate information concerning the exact amounts of the deposits and of refunds which had been made thereon were immediately available, and the parties thereupon asked that only the merits be heard on this reference.

The general average deposits originally required were on the basis of approximately 20 per cent. of the estimated contributory values. The adjusters found that the total general average arising out of both first and second strandings was 9.045 per cent. The respondent does not dispute its obligation to return to the libelant all sums deposited, with interest, in excess of the net amounts found to be due by the adjusters. In fact, the libelant states that a part of such excess has already been returned. Both parties are now seeking to obtain exact information, but at the present time neither can state exactly what the excess is, and thus there is not any evidence in this record on which damages may be computed, irrespective of what the ultimate decision may be on the merits.

I think the case must be disposed of either by dismissing the libel but making the entry of the final decree dismissing the libel contingent on the payment by the respondent of the balances concededly due, or by the entry of an interlocutory decree for the libelant for the excess of each deposit over the amount found due from the respective parcels of cargo according to the statement of the adjusters.

Aside from the procedural novelty of the former alternative, it seems to me that, as the libels allege, and as the respondent has stipulated, that the libelant is the assignee of all right, title, and interest in and to the deposits, and any cause of action against the respondent by reason of the demand and collection of the deposits, the libelant is entitled to a decree for the balance of the deposits, and I therefore advise the court that an interlocutory decree for the libelant should be entered for such excess.

No reason has been suggested why the respondent should not pay interest on the money, of the use of which the libelant has been deprived. I therefore advise the court that the recovery of the libelant should carry interest on the balance of each deposit from the time when it was made.

In view of the decision on the merits, I advise the court that the libelant should be regarded as the unsuccessful party, and hence, in accordance with the order of reference, costs should be decreed in favor of the respondent.

## Appendix.

### A. Findings of Fact.

1. All the facts specifically stated in sections "I. Statement" and "II. The Facts" of the special commissioner's report.

2. The proximate cause of the stranding which gave rise to the general average expenditures was negligent navigation in proceeding too fast and too close to the starboard bank of the channel at or about the time of passing the upbound vessel.

3. The injury consisting of a 5° set in the rudder blade was not a contributing cause of the second stranding. If the injury existed, and further, if it was sufficient to affect at all the steering of the Isis, the power of her engines and the tugs was adequate to correct any tendency to sheer, and there was, in fact, no difficulty in controlling the Isis until near kilometer 17.

4. The injury to the rudder blade itself consisted of a set or bend beginning about the middle or below the middle of the rudder, and running to a maximum of about 5° from the median line of the vessel at the extreme bottom of the rudder. This injury existed at the time of the second docking at Bremen. There is not any direct evidence that it existed, or was known or thought to exist, at any time prior to the second docking. The

injury may have been caused by the first stranding. It probably could not have been caused by the second stranding. It might have been due to some occurrence on the two trips up the river and the one trip down the river, but there is no evidence of any such occurrence. It has not been established by the preponderance of the evidence that the injury to the rudder blade in fact either existed or did not exist at the time the vessel sailed from Bremen. The origin of the injury is left to conjecture.

5. The preponderance of the direct evidence, the maneuver book, and the report of the Seeamt investigation is that the Isis did not develop any marked tendency to sheer to starboard on the way down the river before the second stranding; and that, if there was any such tendency to sheer, the power of the vessel and her tugs was amply sufficient to correct it and to control the vessel.

6. The testimony, expert and otherwise, regarding the question of whether or not a force sufficient to twist the rudder stock 45° would necessarily have bent the rudder also is unconvincing, and is insufficient to form the basis of a definite affirmative or negative finding in this regard.

7. The testimony, expert and otherwise, regarding the question of whether or not a contact sufficient to produce the bend found in the lower part of the rudder blade would have shown its effect on either the wire lashings or the quadrant or both is unconvincing, and is insufficient to form the basis of a definite affirmative or negative finding in this regard. The preponderance of the evidence is that neither the quadrant nor the wire lashings showed any evidence of movement or disturbance between the time they were put on, when the Isis sailed from Bremen, and the time of the second stranding near Vegesack.

8. If the injury to the rudder blade either existed or did not exist in fact when the vessel was dry-docked at Bremen, she was seaworthy for the intended voyage in tow of the tugs described with her rudder lashed amidships.

9. As between the Isis in tow of the three tugs, one ahead and one on each quarter opposite the No. 4 hatch, with her rudder lashed amidships, and the vessel unassisted by tugs with her entire steering gear in working order, the former arrangement provided control and maneuvering power which was clearly superior in congested water and at any speed up to 5 or 6 miles per hour through the water, was equal at about 5–7 miles per hour,

but was inferior at higher speeds and in open waters.

10. Although the advantages of navigating in daylight as compared with darkness are obvious, the owner was not negligent in permitting the vessel to sail at 1 a. m. on February 10th. The judgment to be exercised in determining the relative advantages and disadvantages of light, tide, current, weather conditions, traffic, and the like, should primarily be that of a local pilot. The evidence is clear that the vessel sailed when she did in accordance with the advice and under the direction of a properly selected local pilot.

11. Due diligence was not exercised to ascertain the true condition of the rudder at Bremen, in that (a) the rudder could as a practical matter have been taken off altogether for examination or repair; (b) the rudder was not wholly exposed by the examination which was made; (c) the examination was made under unfavorable conditions in the twilight or early evening darkness; and (d) the examination was made without the attendance of a classification or independent surveyor.

### B. Conclusions of Law.

1. Paragraph 20 of the Punta Arenas form of bill of lading, attached to the libel in action No. 1, is valid and enforceable so as to permit the shipowner to recover a contribution to general average expenses necessitated by a negligent stranding, provided the Isis was either seaworthy or due diligence had been exercised on that behalf, and is not invalidated in the sense of being rendered wholly void by the absence from the bill of lading of an express proviso that the vessel should be seaworthy or due diligence exercised in that behalf: The shipowner, therefore, derives similar rights to contribution in general average from paragraph 20 of the Punta Arenas form of bill of lading and from paragraph 7 of the form of bill of lading under which all the other cargo was shipped.

2. As the respondent refused to deliver any of the cargo unless deposits to secure general average contribution were made, the making of such deposits by the libelant's assignors was not a voluntary payment.

3. Admiralty has jurisdiction of these suits for the alleged breach of the carrier's contract in the bills of lading to deliver the cargo at destination free of liens or charges except those properly incurred.

4. The departure of the Isis from Bremen in tow under the circumstances of this

case, irrespective of whether or not she were seaworthy at that time, was not a deviation.

5. Seaworthiness required as a condition of the application of the Jason clause and of section 3 of the Harter Act (46 USCA § 192) is not seaworthiness in every conceivable regard, irrespective of causal connection with the disaster giving rise to the general average. Such causal connection is necessary for the defeat of the shipowner's right either to recover a general average contribution from the cargo under the Jason clause or to claim the protection of section 3 of the Harter Act.

6. As the requirement of due diligence under the Jason clause and the Harter Act is a nondelegable one, whether the owner attempts to discharge this duty himself or through agents or employees, any failure in discharge is chargeable to the owner.

7. The owner's duty under the Jason clause and the Harter Act to make the vessel seaworthy or to use due diligence to that end, like the warranty of seaworthiness, refers to the time of breaking-ground for the intended voyage, and did not place on the owner of the Isis any additional duty in respect of seaworthiness or due diligence when the vessel sailed from Bremen.

Bigham, Englar, Jones & Houston, of New York City (H. N. Longley, of New York City, of counsel), for libelant.

Haight, Smith, Griffin & Deming, of New York City (John W. Griffin and Wharton Poor, both of New York City, of counsel), for respondent.

FRANK J. COLEMAN, District Judge.

The five suits which have been consolidated were brought by different cargo owners against the carrier to recover cash deposits exacted by the carrier as a condition to the delivery of the cargo. The deposits were demanded for the purpose of covering general average contributions claimed by the carrier from the cargo owners because of the stranding and damage to the vessel while on the voyage.

Upon the consent of all the parties, the suits were referred to a special commissioner to hear the evidence and report his conclusions thereon, but with the express provision that the report should be advisory only and should not be construed as a determination of the issues. The reference was not only consented to, but it is undisputed that the parties themselves selected the special commissioner. After prolonged hearings at which more than 300 pages of testimony were taken and numerous depositions and documents marked in evidence, the special commissioner filed a report in favor of the respondent on the merits of the controversy. To this report both sides have filed exceptions, but those of the respondent relate only to certain special findings which need not be considered if the report is confirmed.

In view of the special commissioner's very careful and comprehensive report, it is unnecessary to restate all the facts. Only three questions need be considered: (1) Whether the vessel was seaworthy when she departed from Bremen; (2) whether this departure under all the circumstances constituted a deviation; and (3) whether the general average clause of the bills of lading covering the Punta Arenas shipment was valid.

1. The special commissioner found that the bend in the rudder blade neither caused the stranding nor rendered the vessel unseaworthy. It is unnecessary at this time to determine whether unseaworthiness which did not contribute to the damage should deprive the respondent of the advantages of the general average clause, because, if the vessel was in fact seaworthy, it is undisputed that subject to the two other questions mentioned above the libelants cannot recover.

The bend in the rudder consisted of a deflection of 5° at the bottom, tapering to about halfway up the blade, where it disappeared. The rudder was lashed amidships without making any allowance for this deflection, and the vessel, assisted by three tugs, one on each quarter and one ahead, with her own twin propellers in operation, was sent from Bremen at night to navigate the tortuous channel of the River Weser to the North Sea and thence to Hamburg. Furthermore, no one was aware of the deflection of the blade, and consequently no allowance for it could have been made in navigation. The river was well lighted, and traffic and tide conditions were more favorable than they would have been by day.

The question whether under all the circumstances the vessel was reasonably fit for the voyage on which she was sent was purely one of fact, which the special commissioner carefully considered. He based his finding to some extent upon the appearance and bearing of the various witnesses who testified before him, as he plainly states in his report. It is impossible to tell from the transcript of the testimony whether he was mistaken in his estimate of these witnesses. The whole purpose of the reference would be lost if the court were under the obligation of deciding

the question de novo, which would be particularly inappropriate where the parties not only consented to the reference, but selected the special commissioner.

It is impossible for me to see that the finding of the special commissioner is against the weight of the evidence, but, on the contrary, it appears to be amply justified if the respondent's experts were more credible than the libelant's. The crucial question was what degree of effect so slight a deflection of the rudder blade would have under the circumstances, and, if the respondent's experts were correct, it was negligible, as the special commissioner found. The evidence to the contrary, including the ambiguous admissions of certain of the respondent's witnesses, would have to yield to a belief in the reliability of the respondent's experts.

2. The contention that the departure from Bremen under the circumstances constituted a deviation is untenable. There was, of course, no change in route, nor was there any increase of risk beyond that contemplated in the contract of affreightment. A change was made in the method of navigation, which consisted of having the vessel continue under her own power but assisted by three tugs instead of steered by her own rudder. The new arrangement was caused by accident, and was reasonably necessary in view of the conditions in Bremen; furthermore, it left the vessel seaworthy for the trip to Hamburg. To hold that it constituted a deviation which abrogated the express contract would be to go beyond any of the decisions which have been cited.

3. As to the Punta Arenas shipments libelants suggest rather than argue that the general average clause is void because it does not expressly contain what the law would otherwise read into it. This places technicality and formalism above substance, and I think the special commissioner was correct in rejecting it.